IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

JAMES L. KERFOOT,                              )
SYLVIA F. KERFOOT, and                         )
PAUL CAMES, as Trustee in Bankruptcy           )
for James and Sylvia Kerfoot,                  )
                                               )
             Plaintiffs,                       )        Civil Action
                                               )
VS.                                            )        File No. 1:13-CV-33 (WLS)
                                               )
FNF SERVICING, INC. (D/B/A                     )
LOAN CARE SERVICING                            )
CENTER, INC.), a foreign                       )
corporation,                                   )
                                               )
             Defendant.                        )
_____          )

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

**STATEMENT OF FACTS[1]**

On March 14, 2006, James and Sylvia Kerfoot obtained a home loan from The CIT

Group/Consumer Finance, Inc., and in connection therewith the Kerfoots executed a promissory note

in the amount of $76,000.00.  (Complaint ¶ 8). On the same date, James and Sylvia Kerfoot executed a

deed to secure debt to grantee Mortgage Electronic Registration Systems, Inc. ("MERS") (as nominee

for The CIT Group/Consumer Finance, Inc.), conveying a security interest in the Kerfoots' home at

1260 Philema Road, Leesburg, Georgia.  (*Id.* ¶ 9 and Exh. 1 attached thereto).  The CIT Group loan

was serviced and billed every month by Vericrest Financial, Inc. (*Id.* ¶ 10).

On October 30, 2009, the Kerfoots entered into a refinance loan agreement with Lend America,

---

[1] James and Sylvia Kerfoot are the individual Plaintiffs in this case and they are residents of Leesburg,
Lee County, Georgia. (Complaint ¶ 1).  Paul Cames is Trustee in Bankruptcy for the Kerfoots and
their bankruptcy case is pending in the Bankruptcy Court in the Middle District of Georgia, Albany
Division, Case No. 11-10234. (*Id.* ¶ 2).

a New York corporation, to borrow $102,055.00.  (*Id.* ¶ 11).  The loan with Lend America was entered into for the purpose of paying off the loan to CIT/Vericrest and to pay off some unsecured loans.  (*Id.* ¶ 12).  Pursuant to the terms of the Kerfoots refinanced loan agreement with Lend America, Lend America promised to pay off the original CIT/Vericrest loan, pay off certain unsecured loans of James and Sylvia Kerfoot, and also loan $10, 732.58 to the Kerfoots.  (*Id.* ¶¶ 13-14 and Exhibits 2 and 3 attached thereto).  On this same date, the Kerfoots executed a security deed granting Lend America a security interest in their home.  (*Id.* ¶ 15 and Exh. 4 attached thereto).  Lend America was supposed to pay off the prior loan to CIT/Vericrest in the amount of $73,863.63 on October 30, 2009 from the proceeds of the $102,055.00 loan. (*Id.* ¶ 16).

James and Sylvia Kerfoot made their first loan payment to Lend America on December 2, 2009 in the amount of $697.23 as required by the terms of their note.  (*Id.* ¶ 17 and Exh. 5 attached thereto).  The Kerfoots made their second loan payment to LoanCare on January 5, 2010 in the amount of $697.73 as required by the terms of their note.[2]  (*Id.* ¶ 18 and Exh. 6 attached thereto).

The Kerfoots believed that Lend America had paid off the earlier loan on their home to CIT/Vericrest as it was supposed to have done on October 30, 2009. (*Id.* ¶ 19).  After making their first two payments on the refinanced Lend America loan, the Kerfoots discovered that Lend America ***had not*** paid off their prior loan to CIT/Vericrest.  (*Id.* ¶ 20).  Due to Lend America's failure to pay off their prior loan to CIT/Vericrest it became delinquent and the Kerfoots struggled to catch up their payments to CIT/Vericrest.  (*Id.* ¶ 21).

In November 2009, Lend America closed its doors and was sued by the U.S. government for false practices in lending on FHA loans.  (*Id.* ¶ 22).  In early December 2009, it became widely known that Lend America was a fraud with online news articles explaining Lend America's fraud appearing on the internet.  (*Id.* ¶ 23 and Exh. 7 attached thereto).  Homeowners in situations similar to the

---

[2] In December of 2009, LoanCare took over the servicing of the Kerfoots' loan.  (*Id.* ¶ 18).

Kerfoots, who had been defrauded by Lend America, also began posting their experiences on the internet. (*Id.* ¶ 24 and Exh. 8 attached thereto). On December 16, 2009, the Government National Mortgage Association ("Ginnie Mae") defaulted Lend America as a servicer of loans and contracted with LoanCare (a division of FNF Servicing, Inc.) to service Lend America's loans. (*Id.* ¶ 25). Included among the loans which Ginnie Mae contracted with LoanCare to service was the loan the Kerfoots had made to Lend America. (*Id.* ¶ 26).

After LoanCare took over the servicing of the Kerfoots' loan with Lend America, it began calling the Kerfoots and sending them letters to pay their monthly payments to LoanCare. (*Id.* ¶¶ 28-29). In January 2010, LoanCare began sending monthly statements to the Kerfoots and continued sending statements until sometime in 2012. (*Id.* ¶¶ 30, 35 and Exh. 10 attached thereto). The Kerfoots, who are an elderly couple, were confused, worried, and upset over who to pay and were in fear of losing their home. (*Id.* ¶ 31). The Kerfoots engaged a lawyer, Christopher Solomon, to assist them in what to do. (*Id.* ¶ 32).

On March 11, 2010, Mr. Solomon wrote a detailed letter to LoanCare explaining that Lend America did not pay off the prior loan to CIT/Vericrest as it was supposed to do.[3] (*Id.* ¶ 33 and Exh. 9 attached thereto). Mr. Solomon's March 11, 2010 letter to LoanCare is a qualified written request ("QWR") within the meaning of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e). (*Id.* ¶ 111). The Kerfoots did not receive a proper response from LoanCare to this QWR as required under RESPA. (*Id.*). Notwithstanding LoanCare's receipt of the March 11, 2010 QWR sent by Mr. Solomon on behalf of the Kerfoots, LoanCare continued in its vigorous efforts to collect from the Kerfoots. (*Id.* ¶ 34).

Either before or shortly after LoanCare took over the servicing of Lend America's loans, it was aware that Lend America was a fraudulent company that, in many cases, had not paid off prior loans

---

[3] At the time of the filing of this Complaint, Plaintiffs could only locate page 1 of Mr. Solomon's letter to LoanCare.

when it refinanced loans for people, like the Kerfoots. (*Id.* ¶ 36). Early on, LoanCare was aware of this fraud by Lend America due to the numerous lawsuits that were filed against LoanCare based on this fraud. (*Id.* ¶¶ 39-41 and Exh. 12 attached thereto). In some cases, LoanCare agreed to compromise the matter by cancelling the mortgage to Lend America and returning the money which the victim of the fraud had paid toward the mortgage. (*Id.* ¶¶ 37-38 and Exh. 11 attached thereto). LoanCare received numerous complaints from people in a similar situation to the Kerfoots where they refinanced their home loan with Lend America and then Lend America did not pay off their prior mortgage. (*Id.* ¶ 42).

On January 17, 2011, the Kerfoots were forced to file bankruptcy in Bankruptcy Court for the Middle District of Georgia, Albany Division. (*Id.* ¶ 43 and Exh. 13 attached thereto). LoanCare then began contacting the Kerfoots' bankruptcy attorney trying to work out a plan where the Kerfoots could catch up on their back payments to LoanCare. (*Id.* ¶¶ 44-45 and Exh. 14 attached thereto). Shortly after the Kerfoots filed bankruptcy, LoanCare filed a Motion for Relief from the automatic stay of the Bankruptcy Court seeking permission from the Bankruptcy court to foreclose on the Kerfoots' home to collect the debt to Lend America. (*Id.* ¶ 46 and Exh. 15 attached thereto). Mr. Emmett Goodman was engaged by LoanCare as local counsel. (*Id.* ¶ 48 and Exh. 16 attached thereto).

On April 6, 2011, counsel for the Kerfoots in the Bankruptcy Court filed a Response to the Motion and a Counterclaim showing that the Lend America loan was fraudulent in that, among other things, Lend America did not pay off the CIT/Vericrest loan. (*Id.* ¶ 49 and Exh. 17 attached thereto). Shortly thereafter, on April 12, 2011, LoanCare withdrew its Motion for Relief from the automatic stay seeking permission to foreclose on the Kerfoots' home. (*Id.* ¶ 50 and Exh. 18 attached thereto).

On June 3, 2011, the Kerfoots were discharged from Bankruptcy Court and no longer were under the protective arm of the Bankruptcy Court. (*Id.* ¶ 51 and Exh. 19 attached thereto). Four days after receiving the Discharge from the Bankruptcy Court, LoanCare began sending letters to the

Kerfoots again threatening to foreclose on their home if they did not pay LoanCare. (*Id.* ¶ 52).   For example, LoanCare sent the Kerfoots a letter dated June 7, 2011, in which it threatened the Kerfoots with foreclosure on their home if they did not pay $12,902.83 before July 8, 2011.  (*Id.* ¶ 53 and Exh. 20 attached thereto).

Immediately thereafter, on July 25, 2011, the Kerfoots sent a certified mail letter to LoanCare, which it received on July 27, 2011, again informing LoanCare that the Lend America loan was a fraud. (*Id.* ¶ 54 and Exh. 21 attached thereto).  The Kerfoots' July 25, 2011 letter to LoanCare is a qualified written request within the meaning of RESPA § 2605(e) to which they did not receive a proper response from LoanCare as required under RESPA.  (*Id.* ¶ 111).  LoanCare continued calling the Kerfoots and threatening the Kerfoots with foreclosure if they did not pay LoanCare.  (*Id.* ¶ 55).

On March 16, 2012, the Kerfoots filed a Motion with the Bankruptcy Court to Reopen their bankruptcy case for the sole purpose of being able to sue LoanCare for the way it treated them.  (*Id.* ¶¶ 56, 59 and Exh. 22 attached thereto).  All of the previous creditors in the Kerfoots' bankruptcy case were served with a copy of the Kerfoots' Motion to Reopen their bankruptcy case.  (*Id.* ¶ 57). LoanCare and the two law firms who represented LoanCare in filing its earlier Motion for Relief from the stay in the Bankruptcy Court seeking permission to foreclose on the Kerfoots' home were all duly served with a copy of the Motion to Reopen the Case.  (*Id.* ¶ 58).  On April 9, 2012, Bankruptcy Judge James D. Walker, Jr. signed an Order reopening the Kerfoots' bankruptcy case.  (*Id.* ¶¶ 60-62 and Exh. 23 attached thereto).  A copy of this Order was also served on LoanCare and its lawyers.  (*Id.* ¶ 61). After the case was reopened, Charlie Gower was appointed by the Bankruptcy Court as special counsel to the Trustee for the purpose of suing LoanCare.  (*Id.* ¶ 63).

On April 4, 2012, LoanCare offered to pay off the Kerfoots' loan to CIT/Vericrest on certain conditions, one condition being a complete release to LoanCare.  (*Id.* ¶¶ 64, 66-67 and Exh. 24 attached thereto).  The Kerfoots could not accept the offer by LoanCare because it would have

immediately placed them in default on their loan with LoanCare. (*Id.* ¶ 65 and Exh. 24 thereto). The April 4, 2012 letter from LoanCare was not sent to the bankruptcy attorneys for the Kerfoots, nor were they copied on the April 4, 2012 letter which was sent to their clients, the Kerfoots. (*Id.* ¶ 68).

On June 22, 2012, LoanCare again wrote directly to the Kerfoots—this time offering to cancel the Lend America mortgage on their home in exchange for a release to LoanCare. (*Id.* ¶¶ 69-70 and Exh. 25 attached thereto). The June 22, 2012 letter from LoanCare to the Kerfoots is identical to the letter LoanCare wrote two years prior to another similarly situated victim of Lend America's fraud, Carlos Morales, on June 25, 2010. (*Id.* ¶¶ 37-40, 71 and Exhibits 11 and 25 attached thereto). The Kerfoots did not "bite" and accept the proposal by LoanCare in its June 22, 2012 letter. (*Id.* ¶ 72).

On October 24, 2012, LoanCare wrote the Kerfoots' bankruptcy attorneys telling them that by not responding, LoanCare would **_imply_** that the Kerfoots accepted their offer to cancel the mortgage and return the payments in exchange for a release of claims to LoanCare. (*Id.* ¶¶ 73-74 and Exh. 26 attached thereto).

On December 11, 2012, LoanCare signed a cancellation of the Lend America security deed and filed the cancellation with the Clerk of Superior Court of Lee County, Georgia on December 18, 2012 in Deed Book 1591, Page 33. (*Id.* ¶ 75). Then on January 22, 2013, LoanCare sent a letter to the Kerfoots with two checks of $697.73 each. (*Id.* ¶¶ 76-77 and Exh. 27 attached thereto).

Due to the actions of LoanCare, the Kerfoots have worried themselves sick and have suffered physically, emotionally and financially. (*Id.* ¶¶ 78-29).

## STANDARD OF REVIEW

Courts generally view motions to dismiss with disfavor. *McBride v. Lawstaf, Inc.,* C.A. No. 1:96-cv-0196, 1996 U.S. Dist. LEXIS 16190, *2 (N.D. Ga. May 28, 1996). In deciding a Rule 12(b)(6) motion, the Court construes the Plaintiffs' Complaint in the light most favorable to Plaintiffs and accepts all well-pled facts as true. *Speaker v. U.S. Dept. of Hlth. & Hmn. Svcs. Ctrs. for Dis.*

*Contrl.,* 623 F.3d 1371, 1379 (11th Cir. 2010). A Complaint does not need detailed factual allegations, but only enough to raise the right to relief above a speculative level. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A Complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Id.* A claim has "facial plausibility" if the factual content allows the Court to draw the reasonable inference that the Defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). This standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295-96 (11th Cir. 2007).

**ARGUMENT & CITATION TO AUTHORITY**

**I.     GEORGIA RICO**

In order to recover damages under Georgia's RICO statute, O.C.G.A. § 16-14-1 *et seq.*, a plaintiff must show that the defendant either "***acquired or maintained***," either "***directly or indirectly***," an interest in money through a pattern of racketeering activity. O.C.G.A. § 16-14-4(a) (emphasis added). In this case, Plaintiffs have alleged that Defendant LoanCare, through a pattern of racketeering activity, acquired and maintained an interest in the Kerfoots money and property in violation of O.C.G.A. § 16-14-4. (Complaint ¶¶ 85-88). "A 'pattern' for purposes of the Georgia RICO Act must consist of at least two incidents of racketeering activity." *Faillace v. Columbus Bank & Trust Co.,* 269 Ga. App. 866, 868 (2004); *see also* O.C.G.A. § 16-14-3(8)(A). Plaintiffs have alleged theft by taking (O.C.G.A. § 16-8-2); theft by conversion (O.C.G.A. § 16-8-4); theft by deception (O.C.G.A. § 16-8-3); mail and wire fraud (18 U.S.C. §§ 1341 and 1343); and sending deceptive commercial emails (O.C.G.A. § 16-9-101) as the predicate acts upon which their Georgia RICO claim is based.<sup>4</sup>

---

<sup>4</sup> Defendant's brief is silent concerning Plaintiffs' allegation that LoanCare committed the predicate act of sending deceptive commercial emails in violation of O.C.G.A. § 16-9-101 (Complaint ¶ 89(f); therefore,

(Complaint ¶¶ 80-102).

Defendant's main contention in support of its motion to dismiss Plaintiffs' Georgia RICO claim is that Plaintiffs did not sufficiently plead the requisite intent necessary for the predicate acts of theft by taking, theft by conversion and theft by deception. Defendant also asserts that Plaintiffs did not sufficiently plead the predicate acts of mail and wire fraud because they did not allege which of the collection calls and letters they contend violate the act.  Defendant's claims are without merit.

> **A.      Plaintiffs Have Sufficiently Pled The Predicate Acts Necessary To Sustain Their Claim Under Georgia RICO.**

As an initial matter, Federal Rule 9(b) provides that "malice, intent, knowledge and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  While Rule 9(b) requires that the circumstances constituting fraud be stated with particularity, it "***does not require a plaintiff to allege specific facts related to the defendant's state of mind" when the alleged fraud occurs***.  *Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1237 (11th Cir. 2008) (emphasis added).  In order to survive a motion to dismiss, Plaintiffs' Complaint, when considered in its entirety, must only contain "sufficient information that Defendants can adequately determine the alleged facts that comprise the RICO claim."  *Peterson v. Sprock*, 2008 U.S. Dist. LEXIS 106898, *11-13 (N.D. Ga. Oct. 24, 2008) (holding that even where the plaintiffs "did not explicitly allege each element in the Georgia RICO section of the Amended Complaint, the elements are clearly pled within the Amended Complaint" and, therefore, met their burden of pleading a Georgia RICO claim); *Moe Dreams, LLC v. Sprock*, 2008 U.S. Dist. LEXIS 116815, *11-13 (N.D. Ga. Oct. 24, 2008)(same); *see also Grant v. State*, 227 Ga. App. 88, 90-91 (1997) (holding that where "[the requisite predicate acts and enterprises comprising the charges against appellants are precisely described and named.…***No greater detail was required to allege the RICO offense under Georgia law***.") (emphasis added).

---

Plaintiffs assume Defendant takes no issue with Plaintiffs' allegation concerning Defendant's commission of this predicate act.

**(1)** __Theft by taking__

Under Georgia law, "[a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." O.C.G.A. § 16-8-2. The Georgia Court of Appeals has explained that "the phrase 'regardless of the manner in which the property is taken or appropriated' is a catch-all phrase rendering our theft by taking statute broad enough to encompass theft by conversion,…or any other of the myriad and even yet-to-be-concocted schemes for depriving people of their property….[W]hen the alleged taking occurs when a defendant fails to perform under a contract with the victim, the 'real issue' _**is whether the defendant accepted or retained the victim's money with no intention to satisfy his obligation under the contract**_." _Bearden v. State,_ 316 Ga. App. 721, 722-723 (2012) (quoting _Smith v. State,_ 265 Ga. App. 57, 59 (2004) (emphasis added).

Defendant erroneously contends that "[i]t is clear from the allegations of the Complaint that LoanCare was not aware that Lend America failed to pay off the prior lender in the Kerfoots case until after the [Kerfoot's] two payments were made." (Def's Brief p. 6). In fact, quite the opposite is true. Plaintiffs Complaint contains the following pertinent allegations, which if accepted as true, as the Court must at the motion to dismiss stage, provide a sufficient basis from which the Court may, at a minimum, reasonably infer that Defendant LoanCare knew Lend America had not paid off the Kerfoot's previous loan and, therefore, had the requisite intent to deprive the Kerfoots of their money at the time it took over servicing of the Kerfoots' loan in December 2009, (and continuing thereafter), sufficient to establish the predicate act of theft by taking:

- In November 2009, Lend America closed its doors and was sued by the U.S. government for false practices in lending on FHA loans. (Complaint ¶ 22).

- In early December 2009, it became widely known that Lend America was a fraud with news articles evidencing such fraud appearing on the internet. (Complaint ¶ 23 and

9

Exhibit 7 attached thereto).

- On December 16, 2009, the Government National Mortgage Association (Ginnie Mae) defaulted Lend America as a servicer of loans and contracted with LoanCare (a division of FNF Servicing, Inc.) to service Lend America's loans. (Complaint ¶ 25).

- Included among the loans which LoanCare was assigned to service was the loan James and Sylvia Kerfoot made to Lend America. (Complaint ¶ 26).

- Either before or shortly after LoanCare took over the servicing of Lend America's loans in December 2009, it became aware that Lend America was a fraudulent company that, in many cases, had not paid off prior loans when it refinanced loans for people. (Complaint ¶ 36).

- Early on, LoanCare was aware of this fraud by Lend America and, in some cases, LoanCare agreed to compromise the matter by cancelling the mortgage to Lend America and returning the money which the victim of the fraud had paid toward the mortgage. (Complaint ¶¶ 37-38 and Exhibit 11 thereto).

- Early on in the servicing of these loans, LoanCare became aware of Lend America's fraud because of numerous lawsuits filed against LoanCare. (Complaint ¶¶ 39-41 and Exhibit 12 thereto).

- Numerous complaints were made to LoanCare by people in a similar situation as the Kerfoots—where they refinanced their home loan with Lend America and their prior mortgage was not paid off.  (Complaint ¶ 42).

Despite all of the above allegations contained in Plaintiffs' Complaint, Defendant LoanCare baldly asserts that even *"[a]ssuming what Plaintiffs allege is true*, it would be *impossible* for LoanCare to have accepted payments from Plaintiff with the intent of depriving the Plaintiffs and other persons of their money." (Def's Brief p. 6) (emphasis added).  This bold declaration defies all logic.  If what Plaintiffs allege is true—that LoanCare was aware of the fraud Lend America had committed in not paying off its borrowers' prior loans at the time it took over servicing in December 2009—then it is reasonable to infer that LoanCare thereafter accepted payments from Plaintiffs and other persons on these fraudulent loans with the intent to deprive them of their money because it would have known that Plaintiffs and others were making payments to LoanCare in lieu of making payments on their prior legitimate home loans which Lend America had not paid off as promised.  (Complaint ¶¶ 22-23, 25-26,

10

36-42, 89(a), 90-91 and Exhs. 7, 11-12). Taken together, the facts detailed above provide a sufficient basis from which the Court may reasonably infer that LoanCare knew at the time it took over servicing of the Lend America loans that Lend America had failed to pay off its borrowers' prior loans, including the Kerfoots' loan, and, therefore, had the requisite intent to deprive Plaintiffs and others of their money by continuing to accept payments on these fraudulent loans.

Even assuming *arguendo* that Defendant did not know at the time it acquired Plaintiffs' loan from Lend America in December 2009 that Lend America had failed to pay off the Kerfoots' previous loan, the predicate act of theft by taking does not necessarily require defendant have the intent to deprive the plaintiff of their property or money **at the exact time it is acquired**. In fact, O.C.G.A. § 16-8-2 specifically contemplates that Defendant may initially come into "lawful possession" of the money or property. It is not until Defendant makes the decision to, and does, "unlawfully appropriate" the property that the requisite intent to deprive the plaintiff of the property is triggered and the offense of theft by taking is complete.[5]

For example, in *Bearden v. State*, two families had contracted with defendant Bearden for the purpose of constructing them modular homes for which Bearden helped them secure the necessary financing. 316 Ga. App. 721, 721 (2012), *cert. denied,* C.A. No. S12C1778, 2013 Ga. LEXIS 277 (Mar. 18, 2013). Bearden then went on to discuss purchasing the modular homes from Precision Homes, a company which at one time he maintained an exclusive purchase agreement entitling him to a discount; however, Precision Homes informed him the agreement had been cancelled and he would now be required to pay full price for the homes in addition to a 25% deposit. *Id.* at 721-722. The Court found that after Bearden failed to reach an agreement with Precision Homes and subsequent to his receipt of money from the families to construct the modular homes, Bearden eventually

---

[5] *See also infra* at § A. (2), Theft by conversion. The Georgia Court of Appeals has found that Georgia's theft by taking statute is broad enough to also encompass claims for theft by conversion. *Bearden v. State,* 316 Ga. App. 721, 722-723 (2012).

11

"abandoned the respective projects without accomplishing any task towards completion…" and "further failed to return any of their funds." *Id.* at 723-724. The court held that "[u]nder these circumstances, the jury was authorized to infer that Bearden acted with fraudulent intent and to find him guilty of theft by taking." *Id.* at 724.  Likewise, even if LoanCare did not know at that time that the Lend America loan was fraudulent at the time it acquired it in December 2009 and can be said to have initially "lawfully acquired" Plaintiffs funds, Plaintiffs have alleged that they put LoanCare on direct written notice of the fraud as early as March 11, 2010.[6]  (Complaint ¶¶ 33-34).  After receiving this written notice from Plaintiffs of the fraud and the fact that Lend America had not paid off their earlier loan, LoanCare thereafter made the decision to keep the Kerfoots money and continue trying to enforce the security interest in their home by pursuing additional payment from the Kerfoots on the fraudulent loan.  (*Id.* ¶¶ 34, 89(a), 90, 97-101).  This conduct is sufficient to infer that from that point in time, LoanCare acted with the fraudulent intent necessary to commit the predicate act of theft by taking by continuing to deprive Plaintiffs' of their money. (*Id.* ¶¶ 89(a), 90).

### (2)    Theft by conversion

Under O.C.G.A. § 16-8-4, theft by conversion is committed when a person "having lawfully obtained funds…of another under an agreement…to make a specified application of such funds…, he knowingly converts the funds…to his own use in violation of such agreement or legal obligation." *Baker v. State*, 143 Ga. App. 302, 302 (1977); *Interagency, Inc.*, 203 Ga. App. at 425.

The predicate act of theft by conversion, like theft by taking discussed above, does not require the defendant to have the intent to deprive the plaintiff of their money or property ***at the exact time that it is acquired***. In support of their theft by conversion claim, Plaintiffs have alleged as follows:

---

[6] Plaintiffs also alleged that LoanCare received direct written notice from them a second time concerning the fraudulent nature of the loan when, on April 6, 2011, their bankruptcy counsel filed a response to LoanCare's motion for relief from the automatic stay of the Bankruptcy Court and a Counterclaim again showing that, among other things, Lend America had not paid off the CIT/Vericrest loan as it had promised.  (Complaint ¶ 49 and Exh. 17 thereto).

12

Plaintiffs have alleged that the purpose of the Lend America loan was to pay off their old loan. (Complaint ¶¶ 12, 16).  Plaintiffs have alleged that they made payments on the Lend America loan believing that Lend America had paid off their old loan as it was required to do under the terms of the loan agreement.  (*Id.* ¶¶ 17-19).  Due to Lend America's fraudulent conduct, which included not paying off the first loans of its borrowers like the Kerfoots and others, Plaintiffs' loan was assigned to LoanCare who knew, at some point early on, that Plaintiffs' earlier loan had not been paid off and, therefore, the payments that Plaintiffs had made on that loan were not used for the specified purpose they were intended—i.e., paying off the earlier loan. (*Id.* ¶¶ 22-26, 33, 36-42, 49, 91 and Exhs. 7-9, 11-12, 17).  Despite being on direct notice that LoanCare had received money from the Kerfoots that was not used for its intended purpose under the loan agreement in paying off the earlier loan, LoanCare continued to retain the Kerfoots' money and the security interest in Plaintiffs' property, thereby wrongfully converting it to LoanCare's own purpose.  (*Id.*). Not only did LoanCare continue to wrongfully deprive Plaintiffs' of their property, but LoanCare repeatedly demanded that Plaintiffs' continue sending them payments on what it knew to be a fraudulent and defaulted loan.  (*Id.* ¶¶ 34, 52, 55).  Plaintiffs have sufficiently alleged the predicate act of theft by conversion.

### (3)     **Theft by deception**

Theft by deception, under Georgia law, occurs when a person "obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3(a). Pursuant to O.C.G.A. § 16-8-3(b), "a person deceives if he intentionally, "(1) creates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false; (2) fails to correct a false impression of an existing fact or past event which he has previously created or confirmed;…(5) promises performance of services which he does not intend to perform or knows will not be performed." O.C.G.A. § 16-8-3(b); *Interagency, Inc. v. Danco Fin. Corp.,* 203 Ga. App. 418, 425 (1992).

Defendant only claims that "Plaintiffs do not allege that LoanCare had any knowledge that Lend America had failed to pay off the original lender in the Kerfoot refinance until after the two payments were made." (Def's Brief p. 7). As Plaintiffs have discussed above, this is simply not true. *See supra* pp. 9-11. At a minimum, the allegations contained in Plaintiffs' Complaint are sufficient to enable the Court to reasonably infer that LoanCare knew—at the time it took over servicing and demanded and accepted the Kerfoots' payments while continuing to maintain a security interest in their home—that the Kerfoots' earlier loan had not been paid off and that the Lend America loan was fraudulent. (Complaint ¶¶ 22-26, 36-42 and Exhs. 7, 11-12). Plaintiffs have alleged that LoanCare falsely represented to them, and others, that they owed payments to LoanCare that they did not owe due to the fraudulent nature of the loan. (*Id.* ¶ 92). Plaintiffs also alleged that LoanCare knew these representations to Plaintiffs and others were false, and despite this knowledge, proceeded to unlawfully appropriate the money and property of Plaintiffs and others knowing that it would not go toward paying off their prior mortgages as promised. (*Id.*).

Finally, the issue of intent is quintessentially a jury question. Whether the defendant had the requisite intent to steal—either by theft by taking, theft by conversion, or theft by deception—is a question properly left for the jury to determine. *Dudley v. State*, 287 Ga. App. 794 (2007), *cert. denied*, No. S08C0319, 2008 Ga. LEXIS 168 (Feb. 11, 2008); *Bearden,* 316 Ga. App. at 723 ("Intent may be found by the jury upon consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is being prosecuted. Whether a defendant has the requisite intent to commit a crime is a question for the jury.").

### (4)     Mail and Wire Fraud

"The elements of the offense of mail fraud under [the statute] are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme. It is not necessary that the scheme contemplate the use of the mails as an essential element." *Interagency, Inc.,* 203 Ga. App. at

14

426-427 (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)).  Defendant's only argument against Plaintiffs' allegations concerning the predicate acts of mail and wire fraud is that Plaintiffs "are attempting to utilize the easiest of predicate acts" and that Plaintiffs did not allege "which mailings or collections calls violated the act." (Def's Brief p. 8).

As an initial matter, Defendant's characterization of mail and wire fraud as "the easiest of predicate acts" is curious.  Plaintiffs are not sure whether Defendant is referring to mail and wire fraud as being the easiest predicate acts for Defendant to commit in this case, or the easiest for Plaintiffs to prove.  Either way, Plaintiffs have sufficiently alleged Defendant's commission of both mail and wire fraud as predicate acts for purposes of their Georgia RICO claim.  (Complaint ¶¶ 89 (d) and (e), 93-95).  Specifically, Plaintiffs have alleged that Defendant LoanCare repeatedly made telephone calls to the Kerfoots and sent letters demanding that the Kerfoots continue making payments on the refinance loan which Defendant LoanCare knew to be fraudulent.  (Complaint ¶¶ 22-26, 28-37, 44, 52-55, 89 (d) and (e), 93-95 and Exhibit 20).  In addition, Plaintiffs have also alleged that in April of 2012, despite being on notice that the Kerfoots were represented by counsel, LoanCare directly sent the Kerfoots, and not their attorneys, a letter in which LoanCare attempted to extort from them a complete release of liability in exchange for paying off the Kerfoots' original CIT/Vericrest loan.  (Complaint ¶¶ 64-65, 67 and Exhibit 24 thereto).  Plaintiffs have alleged that LoanCare directly sent them, and not their attorneys, a second letter on June 22, 2012, in which LoanCare again attempted to extort from them a release of liability this time in exchange for cancelling the Lend America mortgage.  (Complaint ¶¶ 69-71 and Exhs. 69-71).  Plaintiffs have alleged that this letter is identical to a letter LoanCare sent two years prior to Carlos Morales, another victim of the Lend America/LoanCare fraud who, like the Kerfoots, did not have his earlier loan paid off as Lend America had promised. (*Id.* ¶¶ 38, 40, 71 and Exhs. 11-12 thereto).  Despite the Kerfoots' refusal to "bite" and accept either proposal by LoanCare, Plaintiffs have alleged that on October 24, 2012, LoanCare wrote to their bankruptcy attorneys and

15

informed them that LoanCare would *imply* that the Kerfoots' failure to respond to its proposals meant that they had accepted their offer to cancel the Lend America mortgage and return their payments in exchange for a release of their claims against LoanCare. (*Id.* ¶ 73 and Exh. 74).

As for Defendant's assertion that Plaintiffs did not specify which mailings or collections calls violated the act, it is obvious from Plaintiffs' Complaint that they contend that *all of the mailings and collection calls they received from LoanCare violated the act.* Plaintiffs have alleged that LoanCare knew that it was holding a fraudulent loan and trying to collect from the Kerfoots on it anyway *the entire time it held the mortgage* (*see supra* pp. 9-11); therefore, each and every phone call and mailing made by LoanCare to the Kerfoots seeking payment on a loan it knew to be fraudulent was an attempt by LoanCare to further its scheme to swindle the Kerfoots out of money that was not owed and, later, also included improper attempts to exact from the Kerfoots a release of liability.

Plaintiffs have alleged circumstances sufficient to put LoanCare on notice of the predicate acts they allege form the basis of their Georgia RICO claim and enable LoanCare to prepare its responsive pleadings and defenses. Defendant's motion to dismiss Plaintiffs' Georgia RICO claim should be denied.

## II.    FAIR DEBT COLLECTION PRACTICES ACT

### A.    The Statue Of Limitations Is Tolled By 11 U.S.C. § 108(a).

Plaintiffs do not dispute that the statute of limitations for bringing a claim for violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., ("FDCPA") is "one year from the date on which the violation occurs." *Maloy v. Phillips,* 64 F.3d 607 (11th Cir. 1995); 15 U.S.C. § 1692k(d). However, Defendant ignores the fact that the Bankruptcy Code acts to extend the statute of limitations in this case. Specifically, section 108 of the Bankruptcy Code provides as follows:

(a)    If applicable nonbankruptcy law…fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such an action only before the later of—

(1)     the end of such period, including the suspension of such period occurring on or after the commencement of the case; or

(2)     two years after the order for relief.

11 U.S.C. § 108.  In the instant case, Plaintiffs filed a motion to reopen their bankruptcy case on March 16, 2012 for the purpose of suing LoanCare for its wrongful actions against Plaintiffs, which the Court granted on April 9, 2012.  (Complaint ¶¶ 56, 60 and Exh. 22).  Plaintiffs' motion to reopen their bankruptcy case constituted an order for relief under § 108(a)(2) and preserved any claims as to which the limitations period had not already run before the date of filing their motion. *See McQueen v. Barnes,* 2007 U.S. Dist. LEXIS 51670, *9 (N.D. Ga. July 17, 2007).

Plaintiffs note as an initial matter, that Defendant limits its "statute of limitations defense" to ***written communications only***, which completely ignores the fact that Plaintiffs' FDCPA claim encompasses ***both written communications and telephone communications*** that they allege violated the FDCPA.  (Def's Brief p. 9; Complaint ¶¶ 52-53, 55, 68, 69 and Exhs. 20, 24-25).  Just taking the two written communications Defendant admits it sent to the Kerfoots dated June 7, 2011 and October 17, 2011,[7] and applying the tolling provision of Bankruptcy Code section 108(a)(2) as discussed above, shows that the statute of limitations for Plaintiffs to bring an FDCPA claim based on these two communications alone will not have run until March 16, 2014.[8]  Because Plaintiffs filed their Complaint in this case on March 5, 2013, they have stated a viable claim for violation of the FDCPA within the extended statute of limitations as provided by section 108(a)(2) of the Bankruptcy Code.

---

[7] Plaintiffs are not limiting their FDCPA claims to these two communications only as Plaintiffs have alleged that LoanCare repeatedly called them on the phone and sent them numerous letters in violation of the FDCPA. (Complaint ¶¶ 52-53, 55, 68, 69 and Exhs. 20, 24-25).  Plaintiffs used these two communications, which Defendant identified in its brief and admitted to sending, as an example for purposes of their response in opposition to Defendant's motion to dismiss.

[8] The original statute of limitations for a FDCPA claim against Defendant based on the written communications Defendant identified dated June 7, 2011 and October 17, 2011 would have been June 7, 2012 and October 17, 2012, respectively; however, Bankruptcy Code section 108(a)(2) acts to extend that limitations period until March 16, 2014—i.e., two years following the date of the relevant order for relief, which in this case, was March 16, 2012, the date Plaintiffs filed their motion to reopen their bankruptcy case.

**B.      LoanCare Is A Debt Collector In The Instant Case For Purposes Of Plaintiffs'
         FDCPA Claims.**

Defendant contends that Plaintiffs' Fair Debt Collection Practices Act ("FDCPA") claim fails

because LoanCare is not a "debt collector" for purposes of the FDCPA.  This argument fails.

Generally, the FDCPA prohibits "debt collectors from engaging in abusive, deceptive, or unfair

debt collection practices.  15 U.S.C. §§1692 *et seq.*  The FDCPA regulates, among other things, when

and where a debt collector can communicate with a debtor (§ 1692c); restricts whom a debt collector is

permitted to contact concerning a debt (*id.*); prohibits the use of harassing, oppressive, or abusive

measures in the collection of debts (§ 1692d); bans engaging in the use of false, deceptive, misleading,

unfair, or unconscionable means in collecting a debt (§§ 1692e, 1692f); and requires a debt collector to

properly validate debts (§ 1692g).

In order to successfully bring a claim under the FDCPA, a plaintiff must establish that: "(1)

[she] [has] been the object of collection activity arising from a consumer debt; (2) the defendant

attempting to collect the debt qualifies as a 'debt collector' under the Act; and (3) the defendant has

engaged in a prohibited act or has failed to perform a requirement imposed by the FDCPA." *Budhi v.

BAC Home Loans Servs., L.P.*, 2012 U.S. Dist. LEXIS 67030, *17-18 (N.D. Ga. Apr. 16, 2012).  It is

well-established that mortgage servicers typically do not fall within the FDCPA's definition of "debt

collector" unless one of two exceptions is met.  The first exception is when the debt it seeks to collect

***was in default at the time the servicer obtained it***.  15 U.S.C. § 1692a(6)(F).  In this instance, a

mortgage servicer may be considered to be a debt collector for purposes of the FDCPA.  *Clarke v.

Branch Banking & Trust Co.,* C.A. No. 1:12-cv-03383, 2013 U.S. Dist. LEXIS 49875, *16 (N.D. Ga.

Mar. 4, 2013); *Yarney v. Ocwen Loan Serv., LLC,* C.A. No. 3:12-cv-00014, 2013 U.S. Dist. LEXIS

32802, *12 (W.D. Va. Mar. 8, 2013) (holding "mortgage servicers are considered debt collectors under

the FDCPA if they became servicers after the debt they service fell into default.").   The second

instance specifically involves alleged violations of section 1692f(6), which contains an express

exception to the definition of a "debt collector" such that it includes "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests." *Jenkins v. BAC Home Loan Serv., LP,* 822 F. Supp. 2d 1369 (M.D. Ga. 2011). Both of these exceptions apply in the instant case and Plaintiffs specifically address each exception in turn below.

### 1) Plaintiffs' debt was in default at the time LoanCare acquired it in December 2009.

Generally, the key to whether the defendant loan servicer constitutes a "debt collector" for purposes of the majority of the FDCPA sections is whether the debt was in default at the time it was acquired by the servicer. *See* 15 U.S.C. § 1692a(6)(F). Stated another way, a mortgage servicer may be considered to be a debt collector for purposes of the FDCPA *if the debt was in default at the time it was assigned*. *See Clarke,* 2013 U.S. Dist. LEXIS 49875 at *16 (recognizing that a "a creditor could also be a 'debt collector' subject to the statute, if the debt was already in default at the time the creditor acquired it."); *Correa v. BAC Home Loans Serv., LP,* C.A. No. 6:11-cv-1197, 2012 U.S. Dist. LEXIS 159089 (M.D. Fla. Apr. 9, 2012) (same); *Anderson v. Deutsche Bank Nat'l Trust Co.,* C.A. No. 1:11-cv-4091, 2012 U.S. Dist. LEXIS 122130, *9-10 (N.D. Ga. Aug. 6, 2012) ("[A] consumer's creditors, a mortgage servicing company, or an assignee of a debt are not considered 'debt collectors' *so long as the debt was not in default at the time it was assigned*."). The FDCPA defines "debt" as follows:

> [A]ny obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a.

Under the express terms of the Security Deed, the Kerfoots were obligated to "promptly discharge" any lien that had priority over the Lend America loan. (Security Deed at ¶ 7, attached to Complaint as Exh. 4). Specifically, Plaintiffs have alleged that Lend America was supposed to pay off

the earlier loan and, under the terms of the Security Deed, the Kerfoots were obligated to ensure that this earlier lien was extinguished. (Complaint ¶ 16 and Exh. 4 thereto at ¶ 7). The Kerfoots' Security Deed also contains the following provision governing defaults and the lender's corresponding right to accelerate the debt:

> **9. Grounds for Acceleration of Debt.**
>
> > **(a) Default.** Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:
> >
> > > (i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or
> > >
> > > (ii) *Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument*.

(Security Deed at ¶ 9, attached to Complaint as Exh. 4) (emphasis added). The Kerfoots executed the Promissory Note and Security Deed in favor of Lend America on October 30, 2009. (Complaint ¶ 15 and Exh. 4 thereto). Therefore, under the terms and obligations of the Security Deed, the Kerfoots' CIT/Vericrest loan was required to be paid off no later than November 29, 2009, or the Kerfoots would be considered in default. (Security Deed ¶¶ 7 and 9). Plaintiff has alleged, and Defendant does not dispute, that the CIT/Vericrest loan was *never paid off* as required under the terms of the note and security deed. (Complaint ¶ 20). Therefore, at the time LoanCare took over the Kerfoots' loan in December 2009, *the Kerfoots had technically been in default on their debt according to the express terms of their security deed since the end of November* due to Lend America's failure to pay off Plaintiffs' earlier loan. Because the Kerfoots' debt was in default at the time LoanCare received assignment of their loan in December 2009, LoanCare is a "debt collector" for purposes of FDCPA liability in this case.

> **2)      LoanCare is also a debt collector for purposes of section 1692f(6).**

In addition, Section 1692a(6) of the FDCPA expressly carves out an exception to the above

described "debt collector" definition for those alleged violations falling under section 1692f(6). Specifically, the act states as follows:

> **For the purpose of 15 U.S.C. § 1692f(6)**, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which *is the enforcement of security interests*.

15 U.S.C. § 1692a(6) (emphasis added). The Middle District of Georgia has held that "the statutory language in this section refers to 'enforcement of security interests' as opposed to 'enforcement of debts,' significantly broadening the reach of this particular provision." *Jenkins,* 822 F. Supp. 2d at 1375. Pursuant to section 1692f(6), "a debt collector, as broadly defined for purposes of this section" may not use unconscionable or unfair means in the collection of debts and "may not take or threaten to take a consumer's property in a non-judicial action if '(A) there is no present right to the property through an enforceable security interest....'" *Id.* (quoting 15 U.S.C. § 1692f(6)(A)).

The Eleventh Circuit has recently opined that "an entity that regularly attempts to collect debts can be a 'debt collector' beyond § 1692f(6) of the FDCPA, even when the entity is *also* enforcing a security interest." *Birster v. Am. Home Mortg. Servicing, Inc.,* 481 Fed. Appx. 579, 582 (11th Cir. 2012) (citing *Reese v. Ellis, Painter, Ratterree & Adams, LLP,* 678 F.3d 1211 (11th Cir. 2012) (holding that an entity can *both* enforce a security interest *and* collect a debt) (emphasis added). Specifically, the *Birster* court looked at the language contained in the communications the defendant was sending to the plaintiff which demanded payment and referenced debt collection to be "sufficient to constitute debt collection activity and make defendants debt collectors under *all sections of the FDCPA*." *See Hope v. BSI Financial, Inc.,* 2012 U.S. Dist. LEXIS 153971, *10-11 (N.D. Ala. Oct. 26, 2012) (discussing and explaining the Eleventh Circuit's holding in *Birster*).

In *Birster* and in *Hope,* the plaintiffs alleged receiving communications from the defendants demanding payment and including language describing the communication as "an attempt to collect a debt." *Hope,* 2012 U.S. Dist. LEXIS 153971 at *11-12; *Birster,* 481 Fed. Appx. at 583. Specifically,

the *Birster* plaintiffs received a letter from their mortgage servicer stating that their loan servicer "would foreclose on their home unless they cured the default by paying $7,761.14 within 30 days.  The letter also included a disclosure stating "THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE."  481 Fed. Appx. at 583 (emphasis in original).  Similarly, the letter the Kerfoots allege they received from LoanCare dated June 7, 2011, demanded immediate payment of $12,902.83 to reinstate their debt and informed them that the following would occur if they failed to comply:

> If you do not cure the default(s) on or before the date specified above, the full outstanding balance of your loan will be accelerated and become due in full.  Unless you could pay the loan off in full, we would refer your loan to a firm in your area that will begin foreclosure proceedings in accordance with the terms of your Mortgage/Deed of Trust.  You could lose your home unless you bring this loan current.

(Complaint ¶¶ 52-53 and Exh. 20 thereto).  The Kerfoots' letter from LoanCare goes on to state: "***This communication if [sic] from a debt collector and is an attempt to collect a debt.  Any information obtained may be used for that purpose***."  (*Id.*) (emphasis added).  Based on the same language, the *Birster* Court concluded that loan servicer AHMSI "may be liable under the FDCPA beyond § 1692f(6) even though it was also enforcing a security interest."  481 Fed. Appx. at 583.  The *Hope* court also held that substantially similar facts "are sufficient to survive a motion to dismiss and undermine Defendant's contention that they were not engaged in debt collection activity."  2012 U.S. Dist. LEXIS 153971 at *11.

Plaintiffs have alleged that LoanCare made persistent efforts to collect a debt—i.e., mortgage payments, on a loan it knew to be fraudulent (and in default) at the time it acquired Plaintiffs' loan in December 2009.  (Complaint ¶¶ 28-30, 35, 44, 53, 55 and Exhs. 10, 14, 20).  Plaintiffs have also alleged that LoanCare used both the mails and an "instrumentality of interstate commerce"—i.e., the telephone—in its unfair and unconscionable attempts to collect the alleged debt and enforce the security interest in Plaintiffs' home, which included threatening Plaintiffs' with foreclosure if they did

22

not comply with LoanCare's demands. (*Id.* ¶¶ 52-53, 55 and Exh. 20). The security interest Plaintiffs had granted to Lend America in their home was unenforceable due to Lend America's breach under the note and security deed in failing to pay off the Kerfoots' prior loan as it was required to do.[9] (Complaint ¶¶ 13-16, 20 and Exhs. 2-4). LoanCare lacked an enforceable security interest and had no present right to possession due to Lend America's fraud and, therefore, LoanCare's repeated threats to foreclose on Plaintiffs home violated FDCPA § 1692f(6).[10]

Plaintiffs have pled sufficient facts to establish LoanCare as a "debt collector" under ***all sections of the FDCPA*** and, thus, Defendant's motion to dismiss this claim must be denied.

## III.     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

LoanCare erroneously argues that the Kerfoots have failed to sufficiently plead their claim for intentional infliction of emotional distress ("IIED"). This argument is without merit.

In order to prevail on a claim for intentional infliction of emotional distress, the plaintiff must prove the following elements: (1) that the conduct complained of was intentional or reckless; (2) that the conduct complained of was extreme and outrageous; (3) a causal connection between the conduct complained of and the emotional distress; and (4) the resulting emotional distress is severe. *United*

---

[9] A well-established general tenant of contract law is that the first party to materially breach a contract cannot be heard to complain when the other party to the contract subsequently fails to perform. *See Martin v. Rollins, Inc.,* 238 Ga. 119 (1977) (holding that the party to a contract who is shown to have breached first "forfeit[s] their right to insist that the other party to the contract strictly comply with its terms."); *In re Castaways/Hidden Harbor Partners, Ltd.,* 64 B.R. 404 (Bankr. M.D. Ga. 1986) (holding that "general principles of contract law bar [the creditor], as the first party who breached…from subsequently complaining of Debtor's breach. …"); *Frost v. Wells Fargo Bank, N.A.,* 2012 U.S. Dist. LEXIS 143584, *24 (W.D. Mich. Oct. 4, 2012) (Under the "first breach doctrine," the first party to breach a contract "cannot maintain an action against the other contracting party for his subsequent breach or failure to perform."); *CCD, L.C. v. Millsap,* 2005 UT 42, P29 (Utah 2005) (same); *Mathews v. PHH Mortg. Corp.,* 283 Va. 723, 730 (Va. 2012) ("[I]f the first breaching party committed a material breach,…that party cannot enforce the contract.").

[10] While *Jenkins* explicitly held that a mortgage servicer may be considered a debt collector for purposes of § 1692f(6), Plaintiffs note that ultimately the *Jenkins* court determined that in that particular case, the defendant BAC Home Loans Servicing, did not violate the act because it held a valid, enforceable security interest in the property. 822 F. Supp. 2d at 1375. In the Kerfoots case, Plaintiffs contend that the Lend America security deed was not enforceable due to Lend America's failure to pay off the Kerfoots earlier loan. *See supra* fn. 8.

*Parcel Serv. v. Moore,* 238 GA. App. 376, 377 (1999).  (1990)).[11]

At the motion to dismiss stage of litigation, the Kerfoots are not required to prove facts that establish LoanCare's conduct as extreme and outrageous.  *Johnson v. CitiMortgage, Inc.,* 351 F.Supp.2d 1368, 1382 (N.D. Ga. 2004); *Rowland v. Haven Props.,* C.A. No. 05 C 1957, 2005 U.S. Dist. LEXIS 13353, *13-14 (N.D. Ill. June 24, 2005).  In order to survive LoanCare's motion to dismiss, the Kerfoots need only allege that LoanCare acted intentionally or recklessly to cause them to suffer severe emotional distress by engaging in extreme and outrageous conduct.  *Johnson*, F.Supp.2d at 1382; *Rowland*, 2005 U.S. Dist. LEXIS 13353 at *13-14.  Plaintiffs' Complaint expressly alleges that LoanCare intentionally or recklessly caused severe emotional damages to Plaintiffs by engaging in outrageous and extreme conduct that has caused Plaintiffs severe and extreme emotional and physical distress.  (Complaint ¶¶ 108-109).  Plaintiffs have also alleged that LoanCare *knew* that Lend America had not paid off their earlier loan to CIT/Vericrest as it was required to do under the terms of the refinance agreement, but continued trying to forcibly extract payments on the Lend America loan from Plaintiffs anyway by threatening to foreclose on their home.  (Complaint ¶¶ 28-30, 35, 44, 53, 55 and Exh. 10, 14, 20).  Plaintiffs have further alleged that as a result of their previous loan not being paid off in accordance with terms of their refinance agreement, and LoanCare's repeated demands that they continue paying on the obviously fraudulent loan anyway, they were "confused, worried, and upset over who to pay and were in fear of losing their home."  (Complaint ¶¶ 12-13, 19-20, 28-31). These allegations are sufficient to state a viable claim for intentional infliction of emotional distress under

---

[11] Courts have recognized that a servicer's "position as the holder of an in-default mortgage puts them in a position of power that could lend itself to outrageous conduct…It may occur by virtue of an abuse by defendant of a relationship which puts him in a position of actual or apparent authority over plaintiff or gives defendant power to affect plaintiff's interests. …Likewise, a mortgagee-mortgagor relationship is certainly another relationship which may give rise to a lower level of conduct needed to be actionable." *Reed v. BAC Home Loans Serv., LP,* C.A. No. 1:11-cv-963, 2012 U.S. Dist. LEXIS 62503, *12-13 (W.D. Mich. May 4, 2012); *see also CitiFinancial Mortg. Co. v. Frasure,* C.A. No. 06-cv-160, 2008 U.S. Dist. LEXIS 32723 (N.D. Okla. Apr. 21, 2008) ("[T]he outrageous or extreme character of conduct required may arise from an abuse of a position or a relationship which gives the actor actual or apparent authority over another or the power to affect another's interest.").

Georgia law.  *Johnson,* 351 F.Supp. 2d at 1368.

## IV.   REAL ESTATE SETTLEMENT PROCEDURES ACT

Plaintiffs have alleged that LoanCare failed to comply with RESPA, 12 U.S.C. § 2605(e), by failing to provide a proper response to two or more qualified written requests.  (Complaint ¶ 111).  Specifically, Plaintiffs have alleged that on March 11, 2010, Mr. Christopher Solomon, an attorney whom they hired to act on their behalf, sent LoanCare a detailed letter explaining their belief that the Lend America loan was fraudulent because their prior loan had not been paid off and requesting that LoanCare cease and desist from trying to collect from the Kerfoots on the fraudulent loan. (Complaint ¶¶ 32-33 and Exh. 9 attached thereto).  This letter constitutes a qualified written request ("QWR") within the meaning of RESPA § 2605(e).[12]  Plaintiffs have alleged that LoanCare's only "response" to Mr. Solomon's letter was to continue in its vigorous efforts to collect from the Kerfoots on the fraudulent loan.[13]  (Complaint ¶ 34).  Plaintiffs have also alleged that they sent LoanCare a second letter dated July 25, 2011 via certified mail and that LoanCare received this letter on July 27, 2011. (Complaint ¶ 54 and Exh. 21 attached thereto).  This letter also constitutes a qualified written request ("QWR") within the meaning of RESPA § 2605(e).[14] Again, LoanCare's only response to this letter

---

[12] RESPA defines a QWR as follows:

> [A] written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).  Plaintiffs' letters to LoanCare dated March 11, 2010 and July 25, 2011 meet this definition.

[13] LoanCare complains that there are no factual allegations supporting Plaintiffs' claim that LoanCare failed to respond to Plaintiffs' qualified written requests.  Since LoanCare *did not provide any written acknowledgement or response whatsoever* to either of Plaintiffs' letters, Plaintiffs are unsure what other supporting allegations LoanCare believes Plaintiff should have alleged.  The Kerfoots received nothing from LoanCare that could arguably form the basis of a proper acknowledgment or response under RESPA § 2605(e).

[14] Plaintiffs point out that the March 11, 2010 letter sent by Mr. Solomon on their behalf and the July 25, 2011 letter they sent to LoanCare via certified mail *are the only two letters Plaintiffs reference sending to LoanCare in their Complaint and both of these letters are attached to the Complaint as exhibits*.  Therefore, it does not take any great stretch of the imagination to reasonably infer that these are the two letters Plaintiffs' are referring

25

from the Kerfoots was to continue calling them and threatening them with foreclosure if they did not acquiesce to LoanCare's demands and make payments on the fraudulent loan. (Complaint ¶ 55).

As for Defendant's contention that Plaintiffs failed to plead injury or damages in support of their RESPA claim, Plaintiffs Complaint expressly includes a claim for recovery of *emotional damages* which are recoverable as *actual damages* under RESPA. *James v. Litton Loan Servicing, L.P.,* 2011 U.S. Dist. LEXIS 361, *21-22 (M.D. Ga. Jan. 4, 2011).

A loan servicer, like LoanCare, who fails to fully comply with and discharge its duties under RESPA, may be held liable for "any actual damages to the borrower as a result of the failure." 12 U.S.C. § 2605(f)(1)(A). The Eleventh Circuit, and district courts in several other circuits, have held that "actual damages to the borrower" recoverable under the remedial consumer protection statute RESPA, include "non-economic damages" such as mental anguish, emotional distress, and pain and suffering. *McLean v. GMAC Mortg. Corp.,* 398 Fed. Appx. 467, 471 (11th Cir. 2010); *James v. Litton Loan Servicing, L.P.,* 2011 U.S. Dist. LEXIS 361, *21-22 (M.D. Ga. Jan. 4, 2011); *Rawlings v. Dovenmeuhle,* 64 F. Supp.2d 1156, 1164-1165 (M.D. Ala. 1999); *Ploog v. Homeside Lending, Inc.,* 209 F. Supp. 2d 863, 870 (N.D. Ill. 2002) ("RESPA's actual damages provision includes recovery for emotional distress."); *Johnstone v. Bank of America, N.A.,* 173 F. Supp. 2d 809, 814-816 (N.D. Ill. 2001); *Carter v. Countrywide Home Loans,* C.A. No. 2009 U.S. Dist. LEXIS 31446, *7-9 (E.D. Va. Apr. 14, 2009); *Wright v. Litton Loan Servicing, L.P.,* C.A. No. 05-02611, 2006 U.S. Dist. LEXIS 15691, *9-10 (E.D. Pa. 2006)(holding that "actual damages" under RESPA "includes damages for non-economic losses such as pain, suffering and emotional distress").

Plaintiff's QWRs informed LoanCare of what Plaintiff contends it already knew—that the underlying Lend America loan was fraudulent—and also pleaded with LoanCare to stop trying to collect this fraudulent debt from them and to retract LoanCare's negative reporting of them to the

---

to in Count Four of their Complaint as the qualified written requests to which LoanCare failed to properly respond. (Complaint ¶¶ 33, 54, 110-111 and Exhs. 9 and 21 thereto).

credit bureaus. (Complaint ¶¶ 33-34, 54 and Exhs. 9 and 21 thereto). LoanCare did not respond to Plaintiffs pleas and instead continued threatening them with foreclosure in an ongoing attempt to extort payments out of them on this fraudulent debt. (*Id.* ¶¶ 34, 55). Plaintiffs have alleged that as a result of Defendant's actions, which have now spanned the course of more than three years, they have suffered physically, emotionally, and financially. (*Id.* ¶ 78). Plaintiffs have also alleged that as a result of LoanCare's actions they have worried themselves sick and have lived in constant fear of losing their home. (*Id.* ¶¶ 31, 79). At the motion to dismiss stage of litigation, Plaintiffs are not required to prove their emotional damages; rather, Plaintiffs are only required to allege sufficient facts that when construed in the light most favorable to Plaintiffs could support a plausible claim for such damages. Defendant's motion to dismiss Plaintiffs' claim for RESPA violations should be denied.

## V.    BREACH OF CONTRACT

Contrary to LoanCare's assertion, Plaintiffs are not required at the pleading stage of litigation to attach the contract and/or identify specific contract language demonstrating the Parties' intent to confer third party beneficiary status on Plaintiffs. *Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servs. Corp.,* C.A. No. 3:06-cv-0575, 2007 U.S. Dist. LEXIS 69235, *26 (N.D. Tex. Sept. 18, 2007) (citing *In re Dann Marine Towing, LC,* C.A. No. 01-3044, 2004 U.S. Dist. LEXIS 5857, *21-22 (E.D. La. Apr. 6, 2004)). In fact, it is LoanCare's "very high burden" to establish that Plaintiffs cannot conceivably prove any set of facts in support of their claim that would entitle them to relief. *Eberhart v. Charter Communs., Inc.,* 518 F. Supp. 2d 1374, 1376 (N.D. Ga. 2007) (quoting *Beck v. Deloitte & Touche,* 144 F.3d 732, 735 (11th Cir. 1998)). Moreover, 'in considering a motion to dismiss, the court must assume that all facts alleged in the plaintiffs' complaint are true, and must liberally construe those allegations.'" *Cromer v. United States EPA,* 143 F. Supp. 2d 1376 (M.D. Ga. 2001) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

In support of their breach of contract claim, Plaintiffs have alleged that they are third party

beneficiaries of written agreements between Ginnie Mae and LoanCare for the servicing of loans made by Lend America which LoanCare took over in December 2009.  (Complaint ¶ 113). Plaintiffs have also alleged that these written agreements provided that LoanCare would perform certain duties for the borrowers' benefit—for example, that LoanCare would honestly, fairly and reasonably conduct its servicing responsibilities as to the Lend America loans which Ginnie Mae took over after it defaulted Lend America as an issuer of loans.  (*Id.* ¶ 114).  Plaintiffs further alleged that LoanCare failed in its responsibilities under these written agreements of which they are third party beneficiaries. (*Id.* ¶ 115).

Defendant's assertion that Plaintiffs are "guessing" as to the existence of an agreement between LoanCare and Ginnie Mae is disingenuous.  Plaintiffs have attached to their Complaint a letter they received from LoanCare in which LoanCare explicitly states as follows:

> On December 16, 2009, the Government National Mortgage Association (Ginnie Mae) defaulted Ideal Mortgage Bankers Ltd. (Ideal Mortgage, d/b/a Lend America Mortgage Corporation) and extinguished Ideal Mortgage's portfolio of loans backing Ginnie Mae guaranteed mortgage-backed securities.  Upon extinguishment, ***Ginnie Mae assumed the role of servicer <u>and contracted with Loancare</u>…to be the master subservicer for all the mortgage-backed securities loans in Ideal Mortgage's portfolio***.

(Exhibit 24 to Complaint).[15]  Plaintiffs' allegations are sufficient to put LoanCare on notice that their third party beneficiary breach of contract claim arises from the servicing agreement between LoanCare and Ginnie Mae.  Because the servicing agreement is not before the Court in connection with LoanCare's motion to dismiss, the Court cannot conclude that Plaintiffs are unable to prove any set of facts that would entitle them to relieve.  *In re Dann Marine Towing, LC,* 2004 U.S. Dist. LEXIS 5857 at \*22.  Accordingly, Plaintiffs should be permitted to proceed to discovery on their breach of contract claim and Defendant's motion to dismiss should be denied.

## VI.   ATTORNEY'S FEES

Subject to the Court's discretion, RESPA expressly provides for the recovery of attorney's fees

---

[15] An identical letter was sent on June 25, 2010 to Mr. and Mrs. Carlos Morales who, like the Kerfoots, were victims of the Lend America/LoanCare fraud.  (Exh. 11 to Complaint).

and litigation costs if the Kerfoots prevail on their RESPA claim.  12 U.S.C. § 2605(f)(3).  When a mortgage servicer is found to have violated its duties under RESPA, the borrowers have routinely been awarded their attorney's fees.  *See e.g., Wright,* 2006 U.S. Dist. LEXIS 15691 at \*12; *Nosek v. Ameriquest Mortg. Co.,* No. 02-46025, 2006 Bankr. LEXIS 2350 (D. Mass. Sept. 19, 2006) (awarding the plaintiff attorneys' fees and costs even when only nominal damages were recovered under RESPA).  Georgia's RICO Act also provides that successful plaintiffs are entitled to recover their attorneys' fees and costs of litigation. O.C.G.A. § 16-14-6(c).

In addition, under Georgia law, where a defendant has acted in bad faith, been stubbornly litigious, or caused the plaintiff unnecessary trouble and expense, it is within the jury's purview to award expenses of litigation. O.C.G.A. § 13-6-11.  Whether Defendant acted in such a manner towards Plaintiffs in the instant case is a question for the jury to be determined from its consideration of the facts and circumstances in this case.  *Tyler v. Lincoln,* 272 Ga. 118 (2000).

## VII.   PUNITIVE DAMAGES

Punitive damages may be awarded in tort actions where clear and convincing evidence proves that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences. O.C.G.A. § 51-12-5.1.  A conscious indifference to the consequences relates to "an intentional disregard of the rights of another." *Tyler v. Lincoln,* 272 Ga. 118, 120 (2000).  The issue of whether punitive damages should be awarded is ordinarily a jury question.  *Fitzsimons v. W.M. Collins Enterprises, Inc.,* 271 Ga. App. 854, 857 (2005).  Likewise, it is a question for the jury as to whether LoanCare acted or failed to act with specific intent to cause harm.  O.C.G.A. § 51-12-5.1(f).  "Intent" is defined to denote either that a person desires the consequences of his act or believes that the consequences are substantially certain to result from it.  *Vitau v. Fred Dean, Inc.,* 203 Ga. App. 801, 805 (1992).  Because Plaintiffs' Complaint states a viable claim against LoanCare for intentional

infliction of emotional distress, as well as allegations that LoanCare's tortious misconduct arose to the level of maliciousness and a conscious disregard for Plaintiffs' rights, the jury may award punitive damages under O.C.G.A. § 51-12-5.1.

In addition, the Georgia RICO Act also provides that plaintiffs who are injured as a result of any violation of the Georgia RICO Act "shall have a cause of action for three times the actual damages sustained, and, where appropriate, punitive damages.  O.C.G.A. § 16-4-6(c).  Defendant's motion to dismiss Plaintiffs' claim for punitive damages must be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny LoanCare's motion to dismiss their claims and allow this case to proceed to a trial by jury.

This 6th day of May, 2013.

Respectfully Submitted,

CHARLES A. GOWER, P.C.

*/s/ Charles A. Gower*___
CHARLES A. GOWER
Georgia Bar No. 303500
MIRANDA J. BRASH
Georgia Bar No. 475203
DAVID T. ROHWEDDER
Georgia Bar No. 104056

1425 Wynnton Road
P. O. Box 5509
Columbus, GA  31906
(706)324-5685
*Attorneys for Plaintiffs*

30

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed "Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss and Brief in Support" with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Kyle S. Kotake
Brock & Scott PLLC
4360 Chamblee Dunwoody Road, Suite 310
Atlanta, Georgia 30341

This 6th day of May, 2013.

*/s/ Charles A. Gower*
CHARLES A. GOWER
Georgia Bar No. 303500

1425 Wynnton Road
P.O. Box 5509
Columbus, Georgia 31906
(706) 324-5685