## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

NATASHA GOLDEN, personal     :
representative and administratrix of the     :
estates of James L. Kerfoot and Sylvia F.     :
Kerfoot, and JOY R. WEBSTER, as     :
trustee in bankruptcy for James and Sylvia :
Kerfoot,     :
    :
    Plaintiffs,     :
    :
v.     :     CASE NO.: 1:13-cv-33 (WLS)
    :
FNF SERVICING, INC. (d/b/a LOAN     :
CARE SERVICING CENTER, INC.),     :
a foreign corporation,     :
    :
    Defendant.     :
    :

## ORDER

Before the Court are FNF Servicing, Inc. (hereinafter LoanCare)'s Motion for Summary Judgment and Motion to Exclude the Expert Testimony of Dr. Arthur R. Holt, Jr. at Trial. (Docs. 71, 75.) On May 20, 2015, the Court ordered supplemental briefing on the Motion for Summary Judgment, which the Parties submitted on June 5, 2015. (Docs. 115, 116, 117.) Additionally, on September 3, 2015, Defendant LoanCare filed a notice of supplemental authority discussing an August 28, 2015 order issued by Judge Clay D. Land as well as a notice of the death of Plaintiff James L. Kerfoot. (Doc. 118.) On September 4, 2015, Plaintiffs moved to substitute Natasha Golden for James Kerfoot and filed a response to LoanCare's notice of supplemental authority. (Docs. 119, 120.) On September 9, 2015, the Court granted Plaintiffs' Motion to Substitute Natasha Golden for James Kerfoot. (Doc. 121.) The Court finds that the Motion for Summary Judgment (Doc. 71) and Motion to Exclude (Doc. 75) are now ripe for review.

## FACTUAL HISTORY

The following facts are derived from LoanCare's Statement of Material Facts (Doc. 71-1) and Plaintiffs' Statements of Facts (Docs. 98-1, 98-5), all of which were submitted in compliance with Local Rule 56, and the record in this case.  Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  For reasons that follow, the Court finds that this case does not contain a genuine dispute of material fact.

Plaintiffs Natasha Golden, the personal representative and administratrix of Sylvia and James Kerfoot's estates, and Joy Webster, trustee in bankruptcy for the Kerfoots, bring this case against Defendant FNF Financing, Inc., doing business as Loan Care Servicing Center, Inc. ("LoanCare"), for its attempts to collect payment on an allegedly fraudulent loan.  Plaintiffs assert claims against LoanCare under the Georgia RICO statute and the Real Estate Settlement Procedures Act and for intentional infliction of emotional distress.

On March 14, 2006, James and Sylvia Kerfoot, both of whom are now deceased, obtained a home loan from CIT Group/Consumer Finance, Inc. for $76,000 ("the CIT loan").  On October 30, 2009, the Kerfoots refinanced their home loan with Lend America. The Lend America loan was in the amount of $102,055 and was secured by a security deed, recorded in Lee County, Georgia. As a part of the refinancing agreement, Lend America promised to pay the Kerfoots' debts in the amount of $9,109.05; pay the remaining balance on the CIT loan, which was $73,863.63; and pay the Kerfoots cash in the amount of $10,732. Lend America paid the $9,109.05 in debts and the $10,732 cash to the Kerfoots. But unbeknownst to the Kerfoots, Lend America never paid off the CIT loan.  On December 2, 2009, the Kerfoots made their first payment on the Lend America loan.

In mid-October 2009, an Assistant U.S. Attorney for the Eastern District of New York moved for injunctive relief against Lend America based on allegations that Lend America had falsely certified that borrowers met Federal Housing Administration (FHA) requirements. (Doc. 39-7 at 2.)  By December 1, 2009, Lend America had ceased operations and

borrowers were alleging that Lend America had failed to pay off prior mortgages that they had refinanced with Lend America. (*Id.* at 2-3.) On December 16, 2009, the Government National Mortgage Association ("Ginnie Mae") defaulted Lend America as a loan servicer, and the next day Ginnie Mae contracted with LoanCare to service Lend America's loans. As a result of the default, Ginnie Mae became the sole owner of the Kerfoots' Lend America loan.   As the master subservicer of the formerly Lend America loans, LoanCare was tasked with collecting monthly payments, providing customer service to borrowers, pursuing delinquent and/or outstanding balances, and handling property disposition on behalf of Ginnie Mae.  Because LoanCare did not hold a security interest in the loans, LoanCare was not authorized to cancel, release, or extinguish any of the formerly Lend America loans without Ginnie Mae's authorization.  In 2011, Michael Primeau, Lend America's president pleaded guilty to one count of bank fraud, 18 U.S.C. §§ 1344.2, 3551, in connection with Lend America's double loan scheme in which "Lend America officers directed that the first mortgages not be paid, as required, at the mortgage loan closings for the Lend America refinanced mortgages, and, instead, used the funds to pay Lend America's operative expenses, including its payroll." (Doc. 71-8 at 4.)   The dates of that scheme, as stated in the information to which Primeau pleaded guilty, were January 2009 to February 2010.  (*Id.*)  Thus, the scheme was ongoing at the time the Kerfoots refinanced their mortgage with Lend America.

LoanCare asked Ginnie Mae for authorization to conduct title reviews on the Lend America loans in order to determine which loans were "double loans," or loans that had not been paid off by Lend America.  Ginnie Mae denied this request; Loan Care, therefore, did not know which Lend America loans, of the 6,000 in the Lend America portfolio, were double loans until the borrowers informed Lend America. However, sometime on or before June 1, 2010, Ginnie Mae began pursuing a title claim with respect to the Kerfoots' Lend America loan.  On June 1, 2010, LoanCare sent a letter to a title insurer making a claim on Ginnie Mae's behalf on the Kerfoots' Lend America loan.

The Court finds that the following facts regarding the communication between the Kerfoots and LoanCare are established in the record.  On January 5, 2010, the Kerfoots made their second and final payment on the Lend America loan to LoanCare. Because Lend

America had not paid off the Kerfoots' CIT Loan, CIT and Vericrest began calling and sending letters to the Kerfoots and threatening foreclosure.  On January 6, 2010, Sylvia Kerfoot called LoanCare and stated that Lend America had not paid off the CIT Loan.  LoanCare told Mrs. Kerfoot that it would research the issue.  On January 12, 2010, Mrs. Kerfoot again called LoanCare and told the representative with whom she spoke that the CIT loan had not been paid off.  On January 15, 2010, Mrs. Kerfoot called LoanCare and stated that the CIT loan had not been paid off and that the Kerfoots would not be making anymore payments to LoanCare.  On January 19, 2010, Mrs. Kerfoot called LoanCare, reiterated that she and her husband would not be making any more payments to LoanCare, and provided LoanCare information on the CIT loan, including an estimated payoff amount and the contact information for CIT/Vericrest.  On January 21, 2010, LoanCare called the Kerfoots and stated that it was aware that the Kerfoots would be making payments on the CIT loan and not on the Lend America loan until the double loan situation was resolved.  On January 22, 2010, Mrs. Kerfoot called LoanCare and gave LoanCare authorization to speak to her niece Natasha Golden.  On January 28, 2010, Mrs. Kerfoot called LoanCare and stated that the Kerfoots' home would be foreclosed on the next month by CIT/Vericrest; LoanCare advised that the double loan issue was still being researched.

On February 5, 2010, LoanCare called the Kerfoots and asked them to provide the payoff amount for the CIT loan.  On February 22, 2010, the Kerfoots called LoanCare to inquire about their loan number.  On March 3, 2010, the Kerfoots called LoanCare to inquire about their loan number.  On April 26, 2010, the Kerfoots again called LoanCare.  At some point, LoanCare employee Dominique Flores was designated as the Kerfoots' single point of contact at LoanCare.  Flores spoke with Mrs. Kerfoot on August 6, 2010.  Mrs. Kerfoot advised Flores that she would provide LoanCare a payoff statement from CIT and that the Kerfoots preferred to keep their CIT loan because they could not afford the payments under the Lend America loan.  Flores' notes also reflect that she spoke with the Kerfoots' attorney, Christopher Solomon, on August 10, 2010.

Additionally, LoanCare sent monthly billing statements to the Kerfoots until the Lend America loan was released, except for during the months the Kerfoots were in bank-

ruptcy proceedings.  These statements contained instructions for recipients such as, "Return this part with your payment;" "Include late payment of [specified amount] if paid after [due date];" and "Please make checks payable to LoanCare . . . ." At the time LoanCare sent the monthly statements, LoanCare did not know how Ginnie Mae would decide to resolve the Kerfoots' double loan issue.

On February 17, 2011, the Kerfoots filed for Chapter 7 bankruptcy.  Consequently, LoanCare transferred the servicing of the Kerfoots' loan to LoanCare's bankruptcy department. On February 21, 2011, LoanCare's bankruptcy department sent the Kerfoots' bankruptcy attorney a form letter regarding the status of the loan and possible loan modification options.  LoanCare's bankruptcy department, through counsel, filed a Motion for Relief from Stay and Waiver of Thirty-Day Requirement in the Kerfoots' bankruptcy case in order to protect the Lend America security deed.  In the motion, LoanCare erroneously stated that the Lend America loan was first in priority and that there were no other secured claims against the Kerfoots' property.  The Kerfoots filed a response to LoanCare's motion and a counterclaim. The Kerfoots' counterclaim also contained erroneous statements about the nature, amount, and status of the Lend America loan. Upon receipt of the response and counterclaim, LoanCare withdrew its Motion for Stay, and the Kerfoots withdrew their counterclaim.  On June 3, 2011, the Kerfoots' bankruptcy case was closed.

After the Kerfoots' bankruptcy case was closed, their Lend America loan was placed into the general population of loans serviced by LoanCare, without any flags or stops placed on it to alert LoanCare employees of the unresolved double loan status.  On June 7, 2011, LoanCare sent a form letter to the Kerfoots regarding the status of their Lend America loan, threatening foreclosure if the Kerfoots did not pay $12,902.83 before July 8, 2011.  Upon receiving the Kerfoots' letter in response, LoanCare placed flags and stops on their account and did not proceed with accelerating the Kerfoots' loan or initiating foreclosure.

On March 23, 2012, LoanCare obtained the payoff information for the Kerfoots' CIT loan directly from Vericrest.  On March 30, 2012, Flores provided the payoff information to Ginnie Mae so that it could make a decision as to how to resolve the Kerfoots' double loan issue.  On April 4, 2012, LoanCare sent a letter to the Kerfoots stating that

Ginnie Mae proposed paying off the Kerfoots' CIT loan and crediting all of the payments the Kerfoots had made on the CIT loan to their Lend America loan in exchange for the Kerfoots' releasing Ginnie Mae and LoanCare from all liability. The Kerfoots did not accept LoanCare's offer because they preferred to keep their CIT loan and have the Lend America loan cancelled. LoanCare then recommended to Ginnie Mae that it cancel the Kerfoots' Lend America loan.

On June 22, 2012, LoanCare sent a letter to the Kerfoots stating that Ginnie Mae proposed to cancel the Kerfoots' Lend America loan and return to the Kerfoots the two payments they had made toward the Lend America loan in exchange for the Kerfoots' releasing LoanCare and Ginnie Mae from all liability. This offer was mailed directly to the Kerfoots rather than their attorney. The Kerfoots never agreed to release all claims against Ginnie Mae and LoanCare, but on December 18, 2012, LoanCare, at the direction of Ginnie Mae, cancelled the Kerfoots' Lend America Loan, and on January 22, 2013, LoanCare sent the Kerfoots two checks in the amounts of the two payments they had made on the Lend America loan.

## STANDARDS OF REVIEW

### I.    Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the nonmovant must point to record evidence that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form"). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

II.     **Local Rule 56**

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56.  Here, LoanCare properly filed a summary judgment motion with a statement of undisputed facts, as required by the Federal Rules of Civil Procedure and the Local Rules of this Court.  (Docs. 70, 71, 71-1.)  Plaintiffs responded to LoanCare's Statement of Facts and provided their own Statement of Facts. (Docs. 98-1, 98-5.)

<u>**ANALYSIS**</u>

I.     **Status of the Kerfoots' Lend America Loan**

The Court finds it necessary to make an initial finding regarding the enforceability of the Kerfoots' Lend America loan once it was taken over by Ginnie Mae and LoanCare.  Under Georgia law, there are two kinds of contract fraud: fraud in the factum and fraud in the inducement.  The Eleventh Circuit, quoting a sister district court's holding, explained the common law difference between the two:

> Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action. On the other hand, [f]raud in the factum occurs when a party procures a[nother] party's signature to an instrument without knowledge of its true nature or contents.

*Solymar Inv., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 994 (11th Cir. 2012) (quoting *Reynolds v. Credit Solutions, Inc.*, 541 F.Supp.2d 1248, 1260 (N.D. Ala. 2008)).  Fraud in the factum renders a contract void *ab initio* while fraud in the inducement renders a contract voidable and capable of transfer.  *Id.* at 994 n. 13; *see also* O.C.G.A. § 13-5-5.  "Of the two, only voidable contracts are subject to rescission but still create legal obligations." *Id.* (citing *Sphere Drake*

8

*Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001)); *see also In re Gulf Apparel Corp.*, No. 91-191-4, 140 B.R. 593, 598 (M.D. Ga. June 1, 1992).

The Court finds that Lend America's double loan scheme, as pleaded guilty to by Michael Primeau, was ongoing at the time the Kerfoots refinanced. The Court finds sufficient evidence in the record to indicate that the Kerfoots, like many others, were victims of fraud in the inducement by which Lend America misrepresented its intention to pay off their first mortgage –"material fact concerning the subject matter of the underlying transaction." Because the Kerfoots' Lend America loan was fraudulently induced, the Court finds that their Lend America loan was voidable.

"Georgia law permits a party alleging fraud in the inducement to either affirm the contract and sue for damages or promptly rescind the contract and sue in tort to recover damages for fraud." *Intercept, Inc. v. Molina Galeana*, 352 F. App'x 405, 405 (11th Cir. 2009) (citing *Ainsworth v. Perreault*, 563 S.E.2d 135, 137 (Ga. Ct. App. 2007)). "An announcement of the intent to rescind the contract must be made in a timely fashion, as soon as the facts supporting the claim for rescission are discovered." *Holloman v. D.R. Horton*, 524 S.E.2d 790, 795 (Ga. Ct. App. 1999) (citations omitted). Furthermore, "[a] party cannot rescind a contract and then act in a manner inconsistent with the repudiation of the contract." *Liberty v. Storage Trust Props., L.P.*, 600 S.E.2d 841, 846 (Ga. Ct. App. 2004).

A rescission must also include an offer to restore the benefits received under the contract or a showing of a sufficient reason why that cannot be done. O.C.G.A. § 13-4-60; *Holloman*, 524 S.E.2d at 795 (quoting *Ben Farmer Realty Co. v. Woodard*, 441 S.E.2d 421, 422 (Ga. Ct. App. 1994)). A rescinding party is not required to return or offer to return the benefit received if he can "show a sufficient reason" for not doing so. *Mitchell v. Backus Cadillac-Pontiac, Inc.*, 618 S.E.2d 87, 93 (Ga. Ct. App. 2005). Such reasons could include: the defrauded party has not yet received a benefit; the defrauded party is entitled to keep the benefit; restoring the benefit would be unreasonable or impossible; or "the amount received under the contract sought to be rescinded may be less than the amount actually due the party seeking to rescind." *Id.*; *Metter Banking Co. v. Millen Lumber & Supply Co., Inc.*, 382 S.E.2d 624, 638 (Ga. Ct. App. 1989).

Here, Plaintiffs argue that the Kerfoots promptly rescinded the Lend America contract but that LoanCare ignored this rescission. (Doc. 117 at 2.)  Plaintiffs argue that the Kerfoots rescinded the contract as early as January 15, 2010 when Mrs. Kerfoot called LoanCare and "stated that because of Lend America's failure to pay off the CIT loan, and on the advice of counsel, the Kerfoots were not going to make any more payments under the Lend America Loan." (*Id.* at 4.) The Kerfoots communicated this to LoanCare during subsequent phone calls.  Dominque Flores' notes, for example, indicate that on August 6, 2010, Mrs. Kerfoot told Flores that the Kerfoots' wanted to keep their CIT loan and have the Lend America loan cancelled because they could not afford the Lend America loan payments. (Doc. 72 at 6-7.)   There is no evidence that the Kerfoots themselves ever offered to repay the $19,841 in benefits they received during any of the Kerfoots' phone communications with LoanCare except for their attorney Chris Solomon's deposition testimony that he attempted to negotiate a payment plan for that debt with LoanCare.  (*Id.* at 8.) In his deposition, Solomon stated, "Options were given where [LoanCare] could be paid back the money that they did invest into the property, which was the $19,000." (Doc. 94 at 89.) Solomon also stated he discussed with LoanCare a payment plan where the Kerfoots would "just continue to pay Vericrest and then just pay the $19,000 just to . . . LoanCare." (*Id.* at 87; *see also id.* at 64.)  Plaintiffs put forth no evidence of when these offers were made.

In *Jones v. Roper*, a purchaser of an apple orchard, after discovering fraud in the orchard seller's representation of how many apples the orchard would produce, stated that he would not receive any more apples and made an "indefinite offer . . . to pay for apples already received, without stating price or value offered." *Jones v. Roper*, 147 S.E. 156, 156 (Ga. Ct. App. 1929). There, a Georgia Court of Appeals held that the offer was not a "definite, unconditional offer, timely made, to restore benefits received by purchaser" sufficient to amount to a rescission. *Id.*  Here, the Court finds that the Kerfoots' offering, through their counsel, to make installment payments on the $19,841 they owed LoanCare was not sufficiently definite to meet the rescission requirements. *See Newton v. Burks*, 229 S.E.2d 94, 95 (Ga. Ct. App. 1976) (explaining that a party seeking to rescind "has in his possession the property or money of the other party, which he [cannot] retain if he intends to rescind").

Furthermore, even if these communications constituted offers to restore, there is no evidence of when they were made and whether they were prompt.

On March 11, 2010, the Kerfoots' attorney Chris Solomon sent LoanCare a letter demanding that LoanCare cease and desist attempting to collect on the Kerfoots' Lend America loan. (Doc. 87 at 10.) That letter did assert that the Lend America loan was fraudulent but did not expressly demand rescission or offer to return the $19,841.05 in benefits the Kerfoots had received under the Lend America contract. (*See id.*) Because this letter contained no offer to return the benefits received or reason why such could not be done, the Court finds that it did not amount to a valid rescission.

On July 25, 2011, approximately 565 days after the Kerfoots learned that Lend America had not paid off their first loan, the Kerfoots sent LoanCare a letter stating that the Lend American loan was a fraud and requesting that LoanCare "immediately cancel this security deed with the Clerk of Lee County Superior Court" and take action to remedy any negative credit reporting associated with the Lend America loan. (Doc. 87 at 38.) This letter also did not offer to return the $19,841.05 in benefits the Kerfoots had received. Because this letter contained no offer to return the benefits received or reason why such could not be done, the Court finds that it did not amount to a valid rescission. Furthermore, this letter could not have constituted a timely rescission as it was made 565 days after the Kerfoots learned that Lend America had not paid off their first loan.

Plaintiffs argue that the Kerfoots had a sufficient reason not to offer to return the $19,841.05 in benefits they received because the amount they could have sought to recover – $102,055, the total value of the Lend America loan –was so much more. However, the Kerfoots would never have been entitled to recover $102,055. A contract remedy designed to make them whole, had they chosen to pursue one, would only have provided for recovery of the amount of the two payments they made on the Lend America loan and cancellation of the security deed. The fact that Lend America did not pay off CIT/Vericrest did not wipe the Kerfoots' debt to CIT/Vericrest clean nor did it entitle the Kerfoots to keep the $19,841.05 in benefits Lend America did pay or to seek $73,863.63 from Lend America.

Plaintiffs also argue that expecting the Kerfoots, an elderly couple living on a fixed income, to return $19,841 in benefits, or even just the $10,732 in cash paid directly by Lend America to the Kerfoots would be unreasonable.  The Court acknowledges that paying back $10,732 or $19,841 would be difficult for the majority of couples, particularly elderly ones, living in this country.  That did not, however, relieve the Kerfoots from their obligations under the contract they knowingly and voluntarily entered into.  Furthermore, if the Kerfoots were not prepared to return the benefits received and rescind the contract, they could have acknowledged the contract and sought damages in court, but they chose not to take that route and instead sought damages on claims that rest on the premise that their loan was validly rescinded.

In summary, the Court finds based on the evidence in the record that the Kerfoots' Lend America loan agreement was induced by fraud and was voidable.  The Court further finds that the Kerfoots did not exercise their right to rescind the agreement because they never timely and with specificity offered to return the $19,841 in benefits they received from Lend America.

## II.    RICO Claim

Count One of Plaintiffs' Amended Complaint alleges LoanCare violated the Georgia Racketeer Influenced and Corrupt Organizations Act by committing the predicate offenses of theft by taking, theft by conversion, theft by deception, mail and wire fraud, and bankruptcy fraud. (Doc. 39 at 14-25.) LoanCare now moves for summary judgment on Count One, asserting that no genuine issue of material fact exists and LoanCare is entitled to judgment as a matter of law on this claim.

The Georgia RICO Act makes it "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A. § 16-14-4. A "pattern of racketeering activity" must consist of at least two instances of a racketeering activity. *Smith v. Chemtura Corp.*, 676 S.E.2d 756, 761 (Ga. Ct. App. 2009) (quoting *All Fleet Refurnishing v. W. Ga. Nat'l Bank*, 634 S.E.2d 802, 805 (2006)). The party seeking damages must show that his "injury flowed directly from at least

one of the predicate acts" and that he was the intended victim. *Wylie v. Denton*, 746 S.E.2d 689, 694 (Ga. Ct. App. 2013) (citing *Longino v. Bank of Ellijay*, 491 S.E.2d 81, 85 (Ga. Ct. App. 1997); *Nicholson v. Windham*, 571 S.E.2d 466, 468 (Ga. Ct. App. 2002)). All of the predicate acts alleged by Plaintiffs are enumerated racketeering activities under the Georgia code.

LoanCare first argues that it is entitled to judgment as a matter of law because Plaintiffs have produced no evidence that a LoanCare employee acted with the necessary specific intent. The Court finds, and LoanCare and Plaintiffs agree, that all of the predicate acts alleged by Plaintiffs are specific intent crimes. (Docs. 72 at 14 (citing cases holding that each of the alleged predicate acts is a specific intent crime); 98 at 8.) "When the nonmoving party has the burden of proof at trial, to prevail at summary judgment the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs.*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). LoanCare argues that Plaintiffs have produced no evidence to create a genuine issue of fact as to whether LoanCare or any of its employees had the specific intent to commit any of the alleged predicate acts.

Because LoanCare is a corporation, Plaintiffs can establish that LoanCare had the specific intent to commit the alleged predicate acts by establishing that a LoanCare employee acted with the specific intent to commit the predicate acts. In *McGee*, the Eleventh Circuit further held that the theory of corporate criminal liability by which a corporation may be held criminally liable for specific intent offenses based on the knowledge and intent of its employees applies to civil claims under Georgia's RICO statute. *Id.* at 1243-44. Specifically, in *McGee*, the Eleventh Circuit considered a Georgia RICO claim against Sentinel, a corporation, in which theft by deception was alleged as the predicate offense. The Circuit held, "To state a claim for theft by deception against Sentinel and survive summary judgment, [the plaintiff] would have had to allege, and present evidence at summary judgment, that a Sentinel employee acted with specific intent to commit theft by deception." *Id.* at 1244. The Circuit expressly rejected the plaintiff's theory of "collective intent" by which he tried to cobble

13

together one employee's knowledge and another employee's action to form criminal intent on the part of the corporation.

### A. Theft by Taking, Theft by Deception, and Theft by Conversion under Georgia Law

Under Georgia law, "[a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." O.C.G.A. § 16-8-2. Intent is a necessary element of the offense. *Edens v. State*, 397 S.E.2d 612, 614 (Ga. Ct. App. 1990). The accused's intent can be inferred from "words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is being prosecuted." *Adams v. Georgia*, 644 S.E.2d 426, 429 (Ga. Ct. App. 2007) (quoting *Palmer v. Georgia*, 533 S.E.2d 802, 803 (Ga. Ct. App. 2000)). Because the term "regardless of the manner in which the property is taken or appropriated" is a catch-all provision, theft by taking is broad enough to encompass theft by deception and theft by conversion. *Bearden v. Georgia*, 728 S.E.2d 874, 877 (Ga. Ct. App. 2012). Thus, although the "evidence must show that the requisite intent . . . was present at the time of the taking," *Brown v. State*, 692 S.E.2d 9, 11 (Ga. Ct. App. 2010), a person may unlawfully retain or keep legally acquired property. *See Bearden*, 728 S.E.2d at 877–78.

A person commits theft by deception when he acts with the specific intent to obtain property using "deceitful means or artful practice" to create a false impression. *McGee*, 719 F.3d at 1242 (quoting O.C.G.A. § 16-8-3(a)). And a person commits theft by conversion when he acts with the specific intent to convert funds or property to his own use in violation of an agreement or legal obligation. O.C.G.A. § 16-8-4.

Plaintiffs allege that LoanCare accepted the Kerfoots' loan payment with the intent to unlawfully acquire or unlawfully retain it. However, because the Lend America loan was never validly rescinded, as the Court has already found, LoanCare was entitled to enforce it on Ginnie Mae's behalf, so accepting and disbursing the one loan payment made directly to LoanCare was not an unlawful taking. Therefore, Plaintiffs cannot establish theft by taking as a predicate offense.

14

Furthermore, even if the loan agreement was validly rescinded, Plaintiffs have put forth no evidence that LoanCare's acceptance and retention of the Kerfoots' loan payment was done with the specific intent to convert the payment to its own use in violation of any legal obligation or to obtain the payment using "deceitful means or artful practice."  The evidence in the record reflects only that LoanCare was acting at the behest of Ginnie Mae and under the belief that the Lend America loans remained valid, though riddled with issues that would be resolved by Ginnie Mae.  Plaintiffs therefore have presented no evidence of the specific intent necessary to establish that LoanCare committed theft by deception or theft by conversion. *See, e.g.*, *Goodwyn v. Capital One, N.A., et al.*, Case No. 4:14-cv-219 (CDL) at 20 (M.D. Ga. Aug. 28, 2015) (finding no evidence that employees of defendant creditor and defendant debt collector maintained specific intent to commit theft by taking, theft by conversion, and mail and wire fraud and that "[a]t most . . . [d]efendants' employees were wrong in their interpretation of bankruptcy law or careless in checking their records).

For those reasons, the Court finds that no genuine issue of material fact exists as to whether Plaintiffs can prove all of the elements of theft by taking, theft by deception, and theft by conversion under Georgia law.  The Court finds that Plaintiffs cannot prove that LoanCare committed those offenses in support of their RICO claim.

### B. Mail and Wire Fraud

A claim of mail fraud, as defined by 18 U.S.C. § 1341, requires a showing that the accused (1) intentionally participated in a scheme to defraud and (2) used the mails to further that scheme. *United States v. Lander*, 668 F.3d 1289, 1295 (11th Cir. 2012) (quoting *United States v. Brown*, 40 F.3d 1218, 1221 (11th Cir. 1994)).  Wire fraud, as defined by 18 U.S.C. § 1343, is the same except the second element requires use of interstate wires to further the scheme.  *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2012). "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *Id.*

Plaintiffs argue that LoanCare knowingly perpetuated Lend America's fraud "by continuing to service and demand payments by phone and by mail on the known fraudulent loans," specifically by sending bills by mail and making collection calls.  (Doc. 98 at 22.)

However, as already discussed, because Plaintiffs have not demonstrated that the Lend American loan was rescinded, Plaintiffs cannot demonstrate that LoanCare acted to perpetuate any sort of fraud by sending routine bills and making phone calls to the Kerfoots while the Lend America loan agreement remained in effect and the double loan issue was openly acknowledge by all Parties. Nor have Plaintiffs provided evidence that LoanCare, through one of its employees, acted with the intent to defraud required to commit mail fraud or wire fraud. The evidence indicates only that LoanCare performed its duties as a master subservicer, notified Ginnie Mae of the Kerfoots' double loan issue, and acted, to the extent it had the power to do so, to resolve the issue.  There is no evidence that any LoanCare employee acted with the specific intent to defraud the Kerfoots. *See, e.g.*, *Goodwyn*, Case No. 4:14-cv-219 (CDL) at 20.   For those reasons, the Court finds that Plaintiffs cannot establish mail and wire fraud as underlying offenses in support of their RICO claim.

### C. Bankruptcy Fraud

Plaintiffs assert that LoanCare committed the RICO predicate act of bankruptcy fraud in violation of 18 U.S.C. § 152(2) – (4) when LoanCare filed a Motion for Relief from Stay in the Kerfoots' bankruptcy case asserting that LoanCare's total claim against the Kerfoots was $109,631.96, including the amount Lend America never paid to satisfy the CIT loan, and falsely stating that the Lend America loan had first priority and that it had "no knowledge, information or belief as to any other secured claims against the property." (Doc. 39-15 at 5.)  In order to commit bankruptcy fraud as alleged by Plaintiffs, a person must act knowingly and fraudulently make a false oath, account, declaration, statement, or claim for proof in a bankruptcy action under Title 11.  18 U.S.C. § 152(2) – (4).

The Parties do not dispute that LoanCare filed a Motion for Relief from Stay that contained inaccurate statements and should not have been filed.  However, LoanCare asserts that this motion was filed by mistake and that Plaintiffs have provided no evidence that a particular LoanCare employee possessed the fraudulent intent necessary to commit bankruptcy fraud.  The Court notes that individuals practicing in this Court from time to time

make inaccurate and false statements in motions, affidavits, and testimony.[1] However, not every inaccurate or false statement made under oath amounts to perjury or fraud.  More often than not, those statements are the result of human error, made without the intent to mislead or defraud.  Here, LoanCare admits error in filing the motion.  And LoanCare admits that at least one of its employees knew that the Plaintiffs' loan was a double loan; knowledge on the part of one employee is not enough, however, to establish fraud. Plaintiffs have produced no evidence that LoanCare, by and through one of its employees, knew about the double loan *and* harbored the intent to defraud in filing the motion. Plaintiffs, therefore, cannot establish that LoanCare committed the predicate act of bankruptcy fraud. *Cf. McGee*, 719 F.3d at 1244.

In sum, the Court finds that Plaintiffs have presented no evidence sufficient to create a genuine issue of material fact as to whether LoanCare committed any of the predicate acts alleged in Plaintiffs' Georgia RICO claim.  For that reason, LoanCare is entitled to judgment as a matter of law as to Count One of Plaintiffs' Amended Complaint, and LoanCare's Motion for Summary Judgment as to that Count is **GRANTED**.

## III.   Intentional Infliction of Emotional Distress

Count Two of the Plaintiffs' Amended Complaint asserts a claim against LoanCare for intentional infliction of emotional distress. (Doc. 39 at 25-26.)  Georgia courts recognize the tort of intentional infliction of emotional distress for intentional or reckless conduct that is "so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff." *Ingram v. JIK Realty Co., Inc.*, 404 S.E.2d 802, 804–05 (Ga. Ct. App. 1991). To establish such a claim, the claimant must show the defendant's conduct was (1) intentional or reckless; (2) extreme and outrageous; and (3) the cause of emotional distress. *Wilcher v. Confederate Packaging, Inc.*, 651 S.E.2d 790, 792 (Ga. Ct. App. 2007). "Whether a claim rises to the requisite level of outrageousness and egregiousness is a question of law to be determined by the Court."

---

[1] Indeed, even Plaintiffs' predecessors in interest made inaccurate statements about the nature, amount, and status of the Lend America loan in their bankruptcy counterclaim; however, no one has suggested that those statements amounted to bankruptcy fraud even though the counterclaim was ultimately withdrawn.  (Docs. 71-1 at 12; 98-5 at 20.)

*Johnson v. Citimortgage, Inc.*, 351 F. Supp. 2d 1368, 1381 (N.D. Ga. 2004) (citing *Yarbray v. S. Bell Telephones & Telegraph Co.*, 409 S.E.2d 835 (Ga. 1991)).

A plaintiff pursuing an IIED claim under Georgia law faces a "stringent" burden. *Ingram*, at 804. "Liability has been found only where the defendant's conduct was 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Higdon v. Jackson*, 393 F.3d 1211, 1222 (11th Cir. 2004) (quoting *Kaiser v. Tara Ford, Inc.*, 546 S.E.2d 861, 868 (Ga. Ct. App. 2001)). While a lawful debt collection rarely rises to an IIED claim, *Latimore v. Gateway Retrieval, LLC*, No. 1:12-cv-286, 2013 WL 791258, at *7 (N.D. Ga. Feb. 1, 2013) (collecting cases), Georgia courts have held a jury can infer IIED from a wrongful foreclosure and actions related to a wrongful foreclosure. *DeGolyer v. Green Tree Servicing, LLC*, 662 S.E.2d 141, 147–48 (Ga. Ct. App. 2008).

LoanCare argues that its actions were merely lawful debt collection actions, while Plaintiffs argue that LoanCare's action were more akin to actions related to wrongful foreclosure. Plaintiffs have presented evidence the LoanCare threatened the Kerfoots with foreclosure on June 7, 2011. LoanCare contends that this threat was made in error, pointing to evidence that upon receiving the Kerfoots' response, LoanCare replaced the flags and stops on the Kerfoots' account and never accelerated the Kerfoots' loan or initiated foreclosure. The Kerfoots were also threatened with foreclosure by CIT because of Lend America's failure to pay off the CIT loan and the Kerfoots' consequently falling behind on their CIT loan payments, but CIT also never initiated foreclosure.

Plaintiffs also argue that LoanCare's erroneously filed Motion to Stay in the Kerfoots' bankruptcy proceedings was extreme and outrageous and caused Mr. Kerfoot's emotional distress. (Doc. 98 at 26.) The Court finds that for a reasonable person the filing of a motion in a bankruptcy action would not naturally "give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress." *Peoples v. Guthrie*, 404 S.E.2d 442, 444 (Ga. Ct. App. 1991). The Court finds that both the erroneously filed motion and the erroneously sent letters threatening foreclosure, while perhaps "[s]harp or sloppy business practices," did not "go beyond all reasonable bounds of decency as to be

utterly intolerable in a civilized community." *United Parcel Serv. v. Moore*, 519 S.E.2d 15, 16 (Ga. Ct. App. 1999).

Finally, the Court finds that LoanCare's sending monthly billing statements and making collection calls, as Plaintiffs allege it did, were lawful debt collection practices in light of the fact that the Kerfoots' Lend America loan had not yet been rescinded.  Although the evidence demonstrates that the Kerfoots, LoanCare, and Ginnie Mae remained in a prolonged period of negotiating a resolution of the double loan issue, the Court finds that LoanCare's debt collection activity during this period was perhaps bad or ill-advised business practice but not extreme and outrageous in light of the fact that the Kerfoots' owed $19,841 on the Lend America loan.  Plaintiffs have put forth no evidence showing that LoanCare's collection activities were so "atrocious and utterly intolerable" as to give rise to an IIED claim. *See, e.g.*, *Goodwyn*, Case No. 4:14-cv-219 (CDL) at 21-22.

The Court finds that Plaintiffs have not put forth evidence of extreme and outrageous acts by LoanCare and therefore cannot establish their IIED claim.  LoanCare is entitled to judgment as a matter of law as to Count Two of Plaintiffs' Amended Complaint and its Motion for Summary Judgment (Doc. 71) is therefore **GRANTED** as to that Count.

## IV.   Real Estate Settlement Procedures Act

Plaintiffs also claim in Count Three of the Amended Complaint that LoanCare did not respond to two or more borrower inquiries in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e). (Doc. 39 at 26.) Under § 2605(e) of RESPA, a loan servicer, upon receipt of a qualified written request regarding the accuracy of an account, must investigate the claim and correct the error or provide a written response explaining why the account is accurate. § 2605(e)(1)(A).  A "qualified written request" (QWR) is defined as a written correspondence that allows the servicer to identify the account and identity of the borrower and "includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." § 2506(e)(1)(B). Under subsection (e), a servicer is required to respond to a QWR "for information relating to the servicing" of the loan. § 2506(e)(1)(A).  RESPA defines "servicing" as "receiving any scheduled periodic pay-

ments from a borrower pursuant to the terms of any loan . . . and making payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." § 2605(i)(3).

RESPA was amended in 2013, but the versions in effect at the time the Kerfoots sent their alleged QWRs provided that when a borrower submitted a QWR, the loan servicer had to provide a written acknowledgment that the QWR was received within twenty days. 12 U.S.C.A. § 2605(e)(1)(A) (West 1996); 12 U.S.C.A. § 2605(e)(1)(A) (West 2011); *Jenkins v. BAC Home Loan Serv., LP*, 822 F.Supp.2d 1369, 1376 (M.D. Ga. 2011). Within sixty days of receiving the QWR, a loan servicer was required to correct the account or investigate the account and provide a written explanation or clarification to the borrower and any information requested by the borrower. § 2605(e)(2). RESPA violations may give rise to non-pecuniary damages, such as emotional distress, and statutory damages of up to $1,000 if there is proof of a pattern and practice of noncompliance with RESPA. *McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010). However, the borrower must present "specific evidence to establish a causal link between the financing institution's violation and [his or her] injuries." *Id.* at 471. This evidence "must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a . . . violation occurred supports an award for compensatory damages." *Id.* (citing *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005)).

Plaintiffs point to two letters that they allege were QWRs requiring a response under RESPA. First, Plaintiffs allege and the evidence in the record shows that the Kerfoots' attorney, Christopher Solomon, wrote LoanCare a letter on March 11, 2010 explaining that the CIT loan was never paid off and demanding that LoanCare "cease and desist" trying to collect on the Lend America loan. (Doc. 39-9 at 2.) Second, Plaintiffs allege and the evidence shows that the Kerfoots sent LoanCare a certified letter on July 25, 2011 stating that the Lend America loan was fraudulent and demanding immediate cancellation of the deed securing the loan and correction of any negative credit reporting related to the Kerfoots' delinquent payments on the loan. (Doc. 39-21 at 2-3.) Plaintiffs allege that despite these letters,

LoanCare continued its collection efforts. LoanCare argues that the two letters were not QWRs because they challenged the validity of the Lend America loan and did not relate to the servicing of the loan. (Doc. 72 at 31.)

The Eleventh Circuit has not directly addressed the question of what kinds of requests "relate to" loan servicing[2], but federal district courts throughout the country have found that written communications from borrowers concerning the validity of a loan or the terms of a loan are not QWRs because they do not directly relate to servicing. *See, e.g., Ward v. Sec. Atl. Mortg. Elec. Registration Sys.*, 858 F.Supp.2d 561, 574-75 (E.D. N.C. 2012); *Wallace v. Bank of Am.*, No. 11-0038, 2011 WL 3859745 at *4 (D. N.J. Aug. 30, 2011); *DeVary v. Countrywide Home Loans, Inc.*, 701 F.Supp.2d 1096, 1109 (D. Minn. 2010); *Cruz v. Mortg. Lenders Network, USA*, No. 09–CV–1679, 2010 WL 3745932 at *2 (S.D. Cal. 2010); *Shatteen v. JPMorgan Chase Bank, Nat'l Ass'n*, Civ. Action No. 4:10–cv–107, 2010 WL 4342071 at *8 (E.D. Tex. Sept. 30, 2010); *Taggart v. Wells Fargo Home Mortg. Inc.*, No. 10–0843, 2010 WL 3769091, at *6 (E.D. Pa. Sept. 27, 2010); *Williams v. Wells Fargo Bank, N.A., Inc.*, No. C 10–00399, 2010 WL 1463521 at *3 (N.D. Cal. April 13, 2010); *Keen v. Am. Home Mortg. Serv., Inc.*, 664 F.Supp.2d 1086, 1096–97 (E.D. Cal. 2009); *Taylor v. Nelson*, No. 02–6558, 2006 WL 266052, at *14 (E.D. Pa. Jan. 31, 2006). For example, one district court within the Eleventh Circuit considered written requests that disputed the validity of a debt and alleged that the lender was "seeking to enforce a voided debt" and found that such requests did not give rise to a RESPA claim because they did not relate to servicing. *Smith v. Bank of Am. Home Loans*, 968 F.Supp.2d 1159, 1170-71 (M.D. Fla. 2013).

The Court first finds that both the March 11, 2010 letter and the July 25, 2011 letter relate to the validity of the Lend America loan, asserting that it was fraudulent and demanding either that it be cancelled or that LoanCare cease collection immediately. (Docs. 39-9 at 2; 39-21 at 2.) The Court agrees with the overwhelming majority of district courts that have

---

[2] However, the Eleventh Circuit did affirm a district court's dismissal of a RESPA claim for failure to state a claim where the court found that a plaintiff had "not alleged that Defendants failed to respond to information requests related to the servicing of her loan, but . . . only alleged that Defendants failed to respond to information requests related to the validity of her loan." *McWeay v. Citibank, N.A.*, 1:11-cv-02875 (N.D. Ga. Nov. 14, 2011), *adopting McWeay v. Citibank, N.A.*, 1:11-cv-02875 (N.D. Ga. Oct. 17, 2011), *aff'd McWeay v. Citibank, N.A.*, 521 F. App'x 784 (11th Cir. 2013).

considered this issue and finds that requests such as these do not directly relate to servicing as it is defined by RESPA but rather to the validity or enforceability of the underlying loan.

The Court notes Plaintiffs' citation to a Northern District of Georgia case holding that a QWR seeking information about "the owner of the loan and the owner's agents, the transfer of the beneficial rights to the underlying loan, and the recording of the transfer" related to the servicing of a loan.  (Doc. 98 at 29 (citing *Davis v. Greenpoint Mortg. Funding, Inc.*, Civ. Action No. 1:09–CV–2719, 2011 WL 7070222 at *4 (N.D. Ga. Sept. 19, 2011).)  The Court finds that the information sought in *Davis* is distinguishable from a request asserting that a loan is entirely *void* or *voidable* and *fraudulent* and seeking rescission or a halt in collection efforts.  Loan servicers do, more often than not, have access to information regarding billing, payments, the owner of a loan and the owner's agents, and transfers of a loan from one owner to another.  Thus, it makes sense that servicers –who perform the work of "servicing" as defined by RESPA –should be required to provide such information to borrowers upon request.  However, in many situations and in the instant case, loan servicers do not have unilateral authority to cancel loans or respond to rescission demands on behalf of the lender for which they provide services.  An assertion that a loan is void or voided or a rescission demand cannot be said to relate to the servicing of a loan just because the consequence of either would be that all activities encompassed by the term "servicing" would cease.

The Court finds that Plaintiffs have not established that the Kerfoots made a QWR directly relating to the servicing of their Lend America loan sufficient to give rise to a claim under RESPA.  For that reason, LoanCare is entitled to judgment as a matter of law on Plaintiffs' RESPA claim as to Count Three of the Amended Complaint and its Motion for Summary Judgment (Doc. 71) is **GRANTED** as to that Count.

## V.    Attorneys' Fees and Punitive Damages

Because the Court herein grants LoanCare's Motion for Summary Judgment as to all of Plaintiffs' substantive claims, the Court also **GRANTS** LoanCare's Motion for Summary Judgment (Doc. 71) as to Plaintiffs' Count Four claim for attorneys' fees and Count Five claim for punitive damages.

## CONCLUSION

For the reasons set forth herein, LoanCare's Motion for Summary Judgment (Doc. 71) is **GRANTED**.  It is hereby **ORDERED AND ADJUDGED** that Plaintiffs shall take nothing by their Amended Complaint (Doc. 39) and judgment shall enter in the Defendant LoanCare's favor.  Also, because summary judgment is herein granted, LoanCare's Motion to Exclude the Expert Testimony of Dr. Arthur R. Holt, Jr. at Trial (Doc. 75) is **DENIED as moot**.

**SO ORDERED**, this 10th day of September, 2015.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**